## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

CARLIN ANDERSON, et al.,

*Plaintiffs-Appellants,*

v.

KWAME RAOUL, in his official capacity
as Attorney General of Illinois, et al.,

*Defendants-Appellees.*

LARRY MORSE, et al.,

*Plaintiffs-Appellants,*

v.

KWAME RAOUL, in his official capacity
as Attorney General of Illinois, et al.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS (No. 23-cv-00728)
HONORABLE DAVID W. DUGAN

## BRIEF AND REQUIRED SHORT APPENDIX OF PLAINTIFFS-APPELLANTS

Stephen D. Stamboulieh
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
Telephone: (601) 852-3440
stephen@sdslaw.us

Alan Alexander Beck
LAW OFFICE OF ALAN BECK
2692 Harcourt Drive
San Diego, CA 92123
Telephone: (619) 905-9105
alan.alexander.beck@gmail.com

David H. Thompson
*Counsel of Record*
Peter A. Patterson
Athanasia O. Livas
Jack Tucker
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
dthompson@cooperkirk.com

David G. Sigale
LAW FIRM OF DAVID G. SIGALE, P.C.

55 West 22nd Street, Suite 230
Lombard, IL 60148
Telephone: (630) 452-4547
Fax: (630) 596-4445
dsigale@sigalelaw.com

*Counsel for Plaintiffs-Appellants*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __25-2642__

Short Caption: __Carlin Anderson, et al. v. Kwame Raoul, et al.__

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

__Carlin Anderson and Dave Clark__

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

__Cooper and Kirk, PLLC__

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        __N/A__

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        __N/A__

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

__N/A__

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

__N/A__

Attorney's Signature: __/s/ David H. Thompson__    Date: __September 23, 2025__

Attorney's Printed Name: __David H. Thompson__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✓]  **No** [ ]

Address: __Cooper and Kirk, PLLC, 1523 New Hampshire Ave. NW, Washington D.C. 20036__

_____

Phone Number: __(202) 220-9659__    Fax Number: __(202) 220-9601__

E-Mail Address: __dthompson@cooperkirk.com__

rev. 12/19 AK

☑

# CERTIFICATE OF SERVICE

### Certificate of Service When All Case Participants Are CM/ECF Participants

I hereby certify that on ___September 23, 2025___, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/___David H. Thompson_____

☐

# CERTIFICATE OF SERVICE

### Certificate of Service When Not All Case Participants Are CM/ECF Participants

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                                    address:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

s/_____

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2642

Short Caption: Carlin Anderson, et al. v. Kwame Raoul, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 Carlin Anderson and Dave Clark

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Cooper and Kirk, PLLC

(3)     If the party, amicus or intervenor is a corporation:

   i)       Identify all its parent corporations, if any; and

   N/A

   ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: /s/ Peter A. Patterson                    Date: September 23, 2025

Attorney's Printed Name:  Peter A. Patterson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [  ]  **No** [✓]

Address:  Cooper and Kirk, PLLC, 1523 New Hampshire Ave. NW, Washington D.C. 20036

Phone Number:  (202) 220-9600                    Fax Number:  (202) 220-9601

E-Mail Address: ppatterson@cooperkirk.com

☑

# CERTIFICATE OF SERVICE

**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on <u>September 23, 2025</u>, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ <u>Peter A. Patterson</u>

☐

# CERTIFICATE OF SERVICE

**Certificate of Service When Not All Case Participants Are CM/ECF Participants**

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                          address:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

s/_____

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2642

Short Caption: Carlin Anderson, et al. v. Kwame Raoul, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Carlin Anderson and Dave Clark

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Cooper and Kirk, PLLC

(3)    If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and
N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ Athanasia O. Livas          Date: September 23, 2025

Attorney's Printed Name: Athanasia O. Livas

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: Cooper and Kirk, PLLC, 1523 New Hampshire Ave. NW, Washington D.C. 20036

Phone Number: (202) 220-9600          Fax Number: (202) 220-9601

E-Mail Address: alivas@cooperkirk.com

rev. 12/19 AK

☑

# CERTIFICATE OF SERVICE
### Certificate of Service When All Case Participants Are CM/ECF Participants

I hereby certify that on ___September 23, 2025___, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ ___Athanasia O. Livas_____

☐

# CERTIFICATE OF SERVICE
### Certificate of Service When Not All Case Participants Are CM/ECF Participants

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                          address:

_____            _____

_____            _____

_____            _____

_____            _____

_____            _____

_____            _____

_____            _____

_____            _____

s/_____

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As    Clear Form

Appellate Court No: 25-2642

Short Caption: Carlin Anderson, et al. v. Kwame Raoul, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

       ☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Carlin Anderson and Dave Clark

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Cooper and Kirk, PLLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Jack W. Tucker    Date: September 23, 2025

Attorney's Printed Name: Jack W. Tucker

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐  **No** ☑

Address: Cooper and Kirk, PLLC, 1523 New Hampshire Ave. NW, Washington D.C. 20036

Phone Number: (202) 220-9638    Fax Number: (202) 220-9601

E-Mail Address: jtucker@cooperkirk.com

rev. 12/19 AK

☑

# CERTIFICATE OF SERVICE

### Certificate of Service When All Case Participants Are CM/ECF Participants

I hereby certify that on ___September 23, 2025___, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ ___Jack W. Tucker___

☐

# CERTIFICATE OF SERVICE

### Certificate of Service When Not All Case Participants Are CM/ECF Participants

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                               address:

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

s/_____

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2663

Short Caption: Larry Morse, et al. v. Kwame Raoul, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Larry Morse, Theodore Ray Buck

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Stamboulieh Law, PLLC

    Law Office of Alan Beck

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    n/a

Attorney's Signature: /s/ Stephen D. Stamboulieh    Date: 9/23/2025

Attorney's Printed Name: Stephen D. Stamboulieh

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✔]  No [ ]

Address: PO Box 428

    Olive Branch, MS 38654

Phone Number: 6018523440    Fax Number: _____

E-Mail Address: stephen@sdslaw.us

rev. 12/19 AK

☑

# CERTIFICATE OF SERVICE

**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on ___September 23, 2025___, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ ___Stephen D. Stamboulieh___

☐

# CERTIFICATE OF SERVICE

**Certificate of Service When Not All Case Participants Are CM/ECF Participants**

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                              address:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

s/ _____

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __25-2663_____

Short Caption: __Larry Morse et. al. v. Kwame Raoul et. al._____

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Larry Morse, Theodore Ray Buck

_____

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Stamboulieh Law, PLLC

 Law Office of Alan Beck

(3)  If the party, amicus or intervenor is a corporation:

 i)  Identify all its parent corporations, if any; and

   n/a

 ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   n/a

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 n/a

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 n/a

Attorney's Signature: /s/Alan Beck                    Date: 10/27/2025

Attorney's Printed Name:  Alan Alexander Beck

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes [ ]  No [✓]

Address:  2692 Harcourt Drive 92123

  San Diego CA 92123

Phone Number: 619-905-9105                  Fax Number:  n/a

E-Mail Address: alan.alexander.beck@gmail.com

rev. 12/19 AK

☑

# CERTIFICATE OF SERVICE
### Certificate of Service When All Case Participants Are CM/ECF Participants

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/  Alan Beck

☐

# CERTIFICATE OF SERVICE
### Certificate of Service When Not All Case Participants Are CM/ECF Participants

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                              address:

_____              _____

_____              _____

_____              _____

_____              _____

_____              _____

_____              _____

_____              _____

_____              _____

s/_____

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2642

Short Caption: Carlin Anderson and Dave Clark v. Kwame Raoul, et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Carlin Anderson, Dave Clark


(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Cooper & Kirk, PLLC

Law Firm of David G. Sigale, P.C.

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ David G. Sigale          Date: November 2, 2025

Attorney's Printed Name: David G. Sigale

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 55 West 22nd Street, Suite 230

Lombard, IL 60148

Phone Number: 630.452.4547          Fax Number: 630.596.4445

E-Mail Address: dsigale@sigalelaw.com

rev. 12/19 AK

☑

# CERTIFICATE OF SERVICE

**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on __November 2, 2025__, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ __David G. Sigale__

☐

# CERTIFICATE OF SERVICE

**Certificate of Service When Not All Case Participants Are CM/ECF Participants**

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                                    address:

_____              _____

_____              _____

_____              _____

_____              _____

_____              _____

_____              _____

_____              _____

_____              _____

s/ _____

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................iii

STATEMENT REGARDING ORAL ARGUMENT ...................................viii

JURISDICTIONAL STATEMENT .................................................................1

STATEMENT OF THE ISSUE .........................................................................3

INTRODUCTION ...............................................................................................3

STATEMENT OF THE CASE ...........................................................................7

    I.     Firearm Suppressors Are Safe, Effective, and Widely Used by Law-Abiding Citizens. ....................................................................................................7

    II.    Illinois Prohibits and Criminalizes Suppressors, even for the Common Uses of Hearing Protection and Firearm Safety. .......................................13

    III.   Plaintiffs Challenge Illinois's Suppressor Ban under the Second and Fourteenth Amendments. ...................................................................14

STANDARD OF REVIEW .............................................................................16

SUMMARY OF THE ARGUMENT .............................................................16

ARGUMENT ......................................................................................................18

    I.     The Second Amendment's Plain Text Covers the Possession of Suppressors. ..........................................................................................18

    II.    Alternatively, the Second Amendment's Plain Text Covers Suppressors Because They Are Designed to Facilitate the Use or Affect the Functionality of an Arm. ..............................................................................................21

    III.   Suppressors Are Also "Arms" Under this Court's *Bevis* Decision. ................33

CONCLUSION ...................................................................................................38

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF RULE 30(d) COMPLIANCE

SHORT APPENDIX

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Cases**      **Page**

*Adams v. City of Indianapolis,*
   742 F.3d 720 (7th Cir. 2014) ...................................................16

*Andrews v. State,*
   50 Tenn. (3 Heisk.) 165 (1871)........................................... 21, 22

*Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. of N.J.,*
   910 F.3d 106 (3d Cir. 2018) ....................................................28

*Bevis v. City of Naperville,*
   85 F.4th 1175 (7th Cir. 2023).....................................6, 33, 34, 35, 36, 37

*Buchanan-Moore v. County of Milwaukee,*
   570 F.3d 824 (7th Cir. 2009) ...................................................16

*Caetano v. Massachusetts,*
   577 U.S. 411 (2016) .................................................... 6, 18, 30

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) .......................5, 6, 19, 20, 22, 27, 28, 34, 35, 37, 38

*Duncan v. Bonta,*
   133 F.4th 852 (2025) ...............................28, 29, 32, 33, 34

*Dusky v. United States,*
   362 U.S. 402 (1960) .............................................................23

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) ............................................22, 26, 27

*Jackson v. City & County of San Francisco,*
   746 F.3d 953 (9th Cir. 2014) ...................................................28

*Luis v. United States,*
   578 U.S. 5 (2016)...........................................................5, 21, 23

*McConnell v. FEC,*
   540 U.S. 93 (2003) ..............................................................23

*Mock v. Garland,*
   75 F.4th 563 (5th Cir. 2023) ..................................................23

*Moore v. Madigan,*
   702 F.3d 933 (7th Cir. 2012) ...................................................38

*N.Y. State Rifle & Pistol Ass'n v. City of New York,*
    590 U.S. 336 (2020) ........................................................22

*New York State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022)................................3, 5, 6, 19, 24, 30, 38

*Parke v. Raley,*
    506 U.S. 20 (1992) ..................................................23, 24

*Saia v. People of State of New York,*
    334 U.S. 558 (1948) ................................................20, 28

*Schoenthal v. Raoul,*
    150 F.4th 889 (7th Cir. 2025)................................... 19, 38

*Tully v. Okeson,*
    78 F.4th 377 (7th Cir. 2023)...........................................35

*Unite Here Loc. 1 v. Hyatt Corp.,*
    862 F.3d 588 (7th Cir. 2017) .........................................16

*United States v. Bridges,*
    150 F.4th 517 (6th Cir. 2025).......................................34

*United States v. Cox,*
    906 F.3d 1170 (10th Cir. 2018)......................................32

*United States v. Miller,*
    307 U.S. 174 (1939) ................................................22, 28

*United States v. Peterson,*
    150 F.4th 644 (5th Cir. 2025).......................................33

*United States v. Rahimi,*
    602 U.S. 680 (2024) .......................................3, 5, 19, 21

*United States v. Rush,*
    130 F.4th 633 (7th Cir. 2025).......................................38

*United States v. Saleem,*
    No. 23-4693, 2024 WL 5084523 (4th Cir. Dec. 12, 2024) ....................................32

**Constitutional Provisions, Statutes, Codes, and Rules**

U.S. CONST.
    art. I, § 8, cl. 16................................................22
    amend. II................................................18

26 U.S.C.
    § 5841................................................8

§ 5845(a) ..................................................................................8

One Big Beautiful Bill Act § 70436, Pub. L. No. 119-21, 139 Stat. 72 (2025) ...............9

Act of May 8 1792, 1 Stat. 271 ...............................................22

720 Ill. Comp. Stat.
    5/24-1(a)(6)...................................................................14
    5/24-1(b)........................................................................14

730 Ill. Comp. Stat. 5/5-4.5-40(a)....................................14

Fed. R. App. P. 12..............................................................1

## Other Authorities

J. Joel Alicea, *Bruen Was Right*, 174 U. Pa. L. Rev. (forthcoming 2025),
    https://perma.cc/S8WJ-SSWD (manuscript) ........................34

Matthew P. Branch, *Comparison of Muzzle Suppression and Ear-Level Hearing Protection in
    Firearm Use*, 144 Otolaryngology Head & Neck Surg
    950 (2011) ......................................................... 11, 25, 27, 36

Scott E. Brueck, et al., *Measurement of Exposure to Impulsive Noise at Indoor & Outdoor
    Firing Ranges During Tactical Training Exercises*, Nat'l Inst. for Occupational
    Safety & Health (2014), https://perma.cc/JX79-KXY3 ...............12

Lilia Chen & Scott E. Brueck, *Noise and Lead Exposures at an Outdoor Firing Range –
    California*, Nat'l Inst. for Occupational Safety & Health (2011),
    https://perma.cc/GD82-YSL9......................................11, 25, 27, 36

Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 W. Crim. Rev. 44 (2007).............. 13, 37

Joe Engesser, *The Girardoni Air Rifle*, Rock Island Auction Co.,
    https://perma.cc/RG9V-FKK3 ....................................... 7, 8, 31

Matthew Every, *How Does a Silencer Work?*, Field & Stream (May 11, 2023),
    https://perma.cc/3RFQ-6L9Q ............................................9

*Firearms Commerce in the United States: Annual Statistical Update 2021*, BATFE (2021),
    https://perma.cc/9FXV-62FU......................................8, 9

Brian J. Fligor, *Prevention of Hearing Loss from Noise Exposure*, Better Hearing Inst.
    (2011), https://perma.cc/TE5F-4PU8 ...........................10, 13, 37

Gov'ts Suppl. Resp. to Def's. Petition for Rehearing En Banc, *United States v. Peterson*,
    No. 24-30043 (May 29, 2025), Dkt. 135 ......................13, 26, 33

Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second
    Amendment*, 46 Cumb. L. Rev. 33 (2016) ..........................10

*How Do Flashbangs Work?*, CHARLOTTE EYE EAR NOSE & THROAT ASSOCS., P.A. (Mar. 11, 2020), https://perma.cc/UP47-CMVG ............................ 26, 27, 31, 36

*How Hearing Loss Occurs*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://perma.cc/D6BC-96SA ................................................................11, 24, 27

Garry James, *Old Air-Gun Canes: Deadly Accessories for the Dandy*, GUNS & AMMO (Sep. 30, 2022), https://perma.cc/BM3M-YJL5.............................................. 8, 31

Glenn Kessler, *Are Firearms with a Silencer 'Quiet'?*, WASH. POST. (Mar. 20, 2017), https://perma.cc/757W-YHUF ...........................................................................10

David Kopel, *The Hearing Protection Act and 'Silencers,'* WASH. POST. (June 19, 2017), https://perma.cc/FYQ7-D7E3.................................................................... 7, 12

Colleen G. Le Prell, *An Overview of HPDs, New Legislation, and Recommendations for Rifles with Silencers*, THE HEARING REV. (Dec. 2017), https://perma.cc/7434-G8JS ......................................................................24

Edward Lobarinas et al., *Differential Effects of Suppressors on Hazardous Sound Pressure Levels Generated by AR-15 Rifles: Considerations for Recreational Shooters, Law Enforcement, and the Military*, 55 INT'L J. AUDIOLOGY S59 (2016) .................. 12, 36

*Maxim 9 Instruction Manual*, SILENCERCO, https://perma.cc/3VKZ-6CXN................29

HIRAM PERCY MAXIM, EXPERIENCES WITH THE MAXIM SILENCER (1915), https://perma.cc/WY37-3YE2 ...................................................................7

William J. Murphy et al., *Developing a Method to Assess Noise Reduction of Firearm Suppressors for Small-Caliber Weapons*, 33 PROCEEDINGS OF MEETINGS ON ACOUSTICS 1 (2018), https://perma.cc/4CBE-B9SS ..............................24, 25, 27

*Relative Sound Pressure Levels in Decibels (dB) of Firearms*, NAT'L GUN TR. (July 21, 2017), https://perma.cc/J972-2JBE.........................................................26, 27, 31, 35, 36

*Noise Sources and Their Effects*, PURDUE UNIV., https://perma.cc/5T4B-5JC3 ..............10

Wesley Nunley, *The Impact of Suppressors on Shooting Performance*, BLACK CREEK FIREARMS (Aug 19, 2024), https://perma.cc/SCU6-4E4M....................9, 12, 26, 27, 31, 36

Silent Firearm, U.S. Patent No. 958,935 (filed Nov. 30, 1908), https://perma.cc/FNR4-ZFBU ...................................................................7

Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases—Again*, 41 HARV. J.L. & PUB. POL'Y PER CURIAM (Fall 2023), https://perma.cc/8RAK-4RSD ..........................................38

Michael Stewart, *Recreational Firearm Noise Exposure*, AM. SPEECH-LANGUAGE-HEARING ASS'N (2017), https://perma.cc/DYS7-8AXH ............................. 10, 11

*Suppressor Owner Study*, NSSF (2025), https://perma.cc/BRS8-4ZK6 ...........9, 35, 36, 37

Ronald Turk, *White Paper: Options to Reduce or Modify Firearms Regulations,* BATFE (Jan. 20, 2017), https://perma.cc/J6HR-4R3T ..........................................8, 13, 37

Concealed Lock for Fire-arms, English Patent No. 1095 (Aug. 5, 1775), *reprinted in* Peter S. Wainright, *Henry Nock, Innovator 1741 – 1804*, 88 AM. SOC'Y ARMS COLLECTORS BULL., Oct. 2003, https://perma.cc/YJN3-QUHZ.................. 8, 31

E. John Wipfler III, *"Sound Arguments for the Purchase and Use of Firearm Suppressors" A Physician's Perspective and Recommendations*, AM. COLL. OF EMERGENCY PHYSICIANS (Jan 17, 2017), https://perma.cc/8XFC-K8QN..................9, 12, 26, 27, 31, 36

# STATEMENT REGARDING ORAL ARGUMENT

These consolidated appeals pose an important question about whether suppressed firearms are protected by the Second and Fourteenth Amendments to the United States Constitution. Appellants believe oral argument would assist the Court in deciding this issue.

# JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs Theodore Ray Buck Jr., Larry Morse, Dave Clark, and Carlin Anderson filed these actions for declaratory and injunctive relief against Kwame Raoul, the Illinois Attorney General, and other Illinois officials responsible for enforcement of Illinois's suppressor ban (collectively the "State"), under 42 U.S.C. § 1983 and alleged that the suppressor ban and all other related, laws, regulations, policies, and procedures violate the right to keep and bear arms guaranteed by the Second and Fourteenth Amendments. Morse DE42; Anderson DE1.[1]

After it consolidated these actions, Anderson DE47, the district court granted judgment on the pleadings for the State on September 5, 2025, SA:18–19, and entered final judgments on September 8, 2025, Morse DE110. Plaintiffs timely filed their notices of appeal on September 17, 2025, Morse DE111, and September 22, 2025, Morse DE115. FED. R. APP. P. 12. This Court consolidated these appeals for purposes of briefing and disposition. Anderson CA7 DE5. This Court has jurisdiction over these

---

[1] For these consolidated appeals, references to the record are by district court docket entry number (e.g., DE42). References to the district court docket for appeal No. 25-2663 are labeled "Morse," and references for appeal No. 25-2642 are labeled "Anderson." Pincites are to the page numbers from the district court's electronic filing system and follow the colon. (e.g., Anderson DE1:5 or Morse DE42:1). References to the docket entries of this Court are labeled with "CA7" (e.g., Anderson CA7 DE5). And references to the attached short appendix are labeled "SA."

consolidated appeals under 28 U.S.C. § 1291 because Plaintiffs appeal from final judgments.

## STATEMENT OF THE ISSUE

Whether the district court erred when it granted judgment on the pleadings for the State when it concluded that the Second Amendment does not protect the use of firearms outfitted with suppressors.

## INTRODUCTION

The Second Amendment's plain text is implicated whenever "the Government regulates arms-bearing conduct," *United States v. Rahimi*, 602 U.S. 680, 691 (2024), and the State of Illinois has done that here by banning the use of firearm suppressors "that facilitate armed self-defense," *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28 (2022), in myriad ways.

Operating on similar principles as car mufflers, firearm suppressors facilitate the lawful use of firearms by reducing the sound produced by their firing to safer levels. This is beneficial to firearm users and those nearby when a firearm is used for self-defense, hunting, training, or any other lawful purpose. Suppressors also improve the firearm's operation by reducing recoil and muzzle rise, which improve the operator's control and accuracy. Contrary to sensational Hollywood depictions of these devices, the noise from a suppressed firearm is still quite loud—as loud as a firecracker or ambulance siren, in fact.

Suppressors are legal to possess in the vast majority of states, and millions of suppressors are possessed by law-abiding Americans for lawful purposes, including to prevent irreversible hearing damage from firearm use in training, self-defense, and

hunting. Indeed, the Federal Government has described suppressors as the only truly effective means of preventing hearing damage while using a firearm, and it has taken the position that suppressor bans like Illinois's violate the Second Amendment. The hearing protection of a firearm outfitted with a suppressor serves critical self-defense functions, ensuring that an individual defending self, family, and home can prevent the temporary deafness or disorientation caused by a firearm blast. This allows an individual exercising the constitutional right to self-defense to hear an intruder and communicate effectively with family members and the authorities. Similarly, hunters are more aware of their surroundings and better able to communicate with others by reducing or eliminating at-the-ear protection. Suppressors are also critical to safe training with firearms because they help both operators and others using a training facility avoid repeated exposure to unsafe levels of sound and pressure, especially at indoor training facilities that are more common in urban environments.

Despite the many benefits of suppressors, Illinois has enacted a flat prohibition on the possession of these commonly used and safe instruments. The possession of a suppressor in Illinois—even for lawful purposes such as hearing protection or self-defense—subjects an individual to a felony charge and years of imprisonment. And on a motion for judgment on the pleadings, the district court concluded that this ban does not even implicate the Second Amendment's plain text because suppressors themselves are not "arms."

The district court erred, and this ban is unconstitutional under a straightforward application of Supreme Court precedent. A court's first task when confronting a Second Amendment claim is to determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24; *see also Rahimi*, 602 U.S. at 691 (explaining that the Government "bears the burden" of justification when it "regulates arms-bearing conduct"). Here, the relevant conduct is possessing a firearm equipped with a suppressor. Illinois bans suppressors only because of their operation with firearms; indeed, outside of that operation they have no utility. Thus, by banning suppressors, Illinois really is banning the possession of suppressed firearms. And suppressed firearms readily fit within the Supreme Court's broad definition of "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (quoting 1 TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (1771)).

Although this plain text analysis should end the matter, the Second Amendment protects the possession of suppressed firearms for an alternative reason. Constitutional rights protect conduct "closely related" to their exercise. *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). And the right to keep and bear arms would be a hollow one if governments could simply regulate firearm components or accessories that are designed to facilitate or affect the use of firearms. Suppressors are "modern instruments that facilitate armed self-defense" and other lawful purposes

because they are designed to improve firearm safety and operation. *Bruen*, 597 U.S. at 28. As such, the Second Amendment protects their possession for this reason too.

The district court misapplied Supreme Court precedent when it ruled that the Second Amendment does not protect suppressors because, in its view, suppressors have no historical predecessor. The Supreme Court has explained that the Second Amendment covers "*all* instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* (quoting *Heller*, 554 U.S. at 582) (emphasis added). Indeed, the Supreme Court has summarily reversed a lower court reasoning that an item being "a thoroughly modern invention" is a basis for excluding it from the Second Amendment's scope. *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam) (citation omitted). It is thus irrelevant whether suppressors existed in the eighteenth and nineteenth centuries, and the district court plainly erred.

Although this Court's decision in *Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023)—decided after briefing on the motion for judgment on the pleadings in this case was complete—suggests that there is an additional inquiry to determine whether an item is an "arm" covered by the plain text of the Second Amendment, suppressors easily satisfy that standard too. Because of their popularity among law-abiding citizens to improve firearm safety and operation and the rarity of their use for criminal purposes, suppressors are not items predominantly useful for military purposes or not possessed for lawful purposes. And for the same reasons, there is no historical tradition that would permit banning suppressors. The Second Amendment therefore

protects the right of law-abiding citizens to possess suppressors, and this Court should reverse—minimally for further proceedings, or alternatively with instructions to enter judgment for Plaintiffs.

## STATEMENT OF THE CASE

### I. Firearm Suppressors Are Safe, Effective, and Widely Used by Law-Abiding Citizens.

Hiram Percy Maxim invented the first commercially successful suppressor at the dawn of the twentieth century. He dubbed his invention a "silencer" and applied to patent it in 1908. Silent Firearm, U.S. Patent No. 958,935 (filed Nov. 30, 1908), https://perma.cc/FNR4-ZFBU. He later explained that he invented the device to reduce sound disturbance caused by firearms. HIRAM PERCY MAXIM, EXPERIENCES WITH THE MAXIM SILENCER 2–4 (1915), https://perma.cc/WY37-3YE2. Sporting goods magazines of the era regularly advertised the "Maxim Silencer," and its purchasers included President Theodore Roosevelt, who affixed Maxim's suppressor to his Winchester rifle. *See* David Kopel, *The Hearing Protection Act and 'Silencers*,' WASH. POST. (June 19, 2017), https://perma.cc/FYQ7-D7E3.

Although Maxim made suppressors a commercial success, his suppressor was not the first technology to reduce the sound that a gun makes or otherwise mitigate its report. Airguns, which "used gas confined under pressure to power their projectiles instead of gunpowder," emerged in the late sixteenth century. Joe Engesser, *The Girardoni Air Rifle*, ROCK ISLAND AUCTION CO., https://perma.cc/RG9V-FKK3. Their

design made them "much quieter than their black powder contemporaries," nor did they "create obstructing smoke." *Id.* Meriwether Lewis and William Clark carried an airgun on their expedition. Engesser, *supra.* "As air gun development progressed, the arms became more mainstream and proved popular for small- and medium-game getting, targeting and even bird shooting." Garry James, *Old Air-Gun Canes: Deadly Accessories for the Dandy*, GUNS & AMMO (Sep. 30, 2022), https://perma.cc/BM3M-YJL5. Similarly, a 1775 patent for "Concealed Lock" or firing mechanism touted its ability to mitigate the report of a firearm so that no "Spark of Fire or Smoke arises . . . which will in any respect affect or obstruct the Sight of the Object when in Execution." Concealed Lock for Fire-arms, English Patent No. 1095 (Aug. 5, 1775), *reprinted in* Peter S. Wainright, *Henry Nock, Innovator 1741 – 1804*, 88 AM. SOC'Y ARMS COLLECTORS BULL., Oct. 2003, at 13–14, https://perma.cc/YJN3-QUHZ.

Today, millions of suppressors are owned by law-abiding Americans. Anderson DE1:6. Several decades after Maxim invented his suppressor, Congress defined them as a "firearm" under the National Firearms Act of 1934, which subjected suppressors to federal registration requirements as a special class of firearm. 26 U.S.C. §§ 5841, 5845(a). Suppressors are legal to possess in 42 states, Ronald Turk, *White Paper: Options to Reduce or Modify Firearms Regulations,* BATFE, 6 (Jan. 20, 2017), https://perma.cc/J6HR-4R3T, and the number registered with the ATF has increased from 2.6 million as of 2021 to 4.5 million as of December 2024, *see Firearms Commerce in the United States: Annual Statistical Update 2021*, BATFE, 16 (2021),

https://perma.cc/9FXV-62FU; *Suppressor Owner Study*, NSSF, 29 (2025), https://perma.cc/BRS8-4ZK6. Congress recently eased federal regulation of suppressors by eliminating the $200 tax on making and transferring them, effective January 1 of next year. *See* One Big Beautiful Bill Act § 70436, Pub. L. No. 119-21, 139 Stat. 72 (2025).

Modern suppressors, which are hollow tubes with holes at both ends and a series of interior walls called baffles, affect the operation of firearms in several ways. Matthew Every, *How Does a Silencer Work?*, FIELD & STREAM (May 11, 2023), https://perma.cc/3RFQ-6L9Q. When a round is fired, the bullet travels down the barrel, out the muzzle, and enters the suppressor with high-pressure gas following it. *Id.* The baffles capture the gas as the bullet passes, so the gases will slowly dissipate. *Id.* This gas capture reduces both the sound of the muzzle blast from hot gases exiting the barrel and the flash of the firearm. *See* E. John Wipfler III, *"Sound Arguments for the Purchase and Use of Firearm Suppressors" A Physician's Perspective and Recommendations*, AM. COLL. OF EMERGENCY PHYSICIANS (Jan 17, 2017), https://perma.cc/8XFC-K8QN. This gas capture also reduces the force that pushes against the operator and thus reduces recoil and muzzle rise, which enables firearm operators to more accurately place follow-up shots. Wesley Nunley, *The Impact of Suppressors on Shooting Performance*, BLACK CREEK FIREARMS (Aug 19, 2024), https://perma.cc/SCU6-4E4M. The smooth release of gases also contributes to a more predictable bullet path shot-after-shot, which improves precision. *Id.*

Suppressors reduce the concussive force and volume of sound produced by a firearm, which helps to prevent hearing damage to those nearby when it is fired. *See* Brian J. Fligor, *Prevention of Hearing Loss from Noise Exposure*, BETTER HEARING INST., 8 (2011), https://perma.cc/TE5F-4PU8. A suppressor will reduce sound intensity by about 30 decibels. *See* Glenn Kessler, *Are Firearms with a Silencer 'Quiet'?*, WASH. POST. (Mar. 20, 2017), https://perma.cc/757W-YHUF. Decibels operate on a logarithmic scale, so a 10-decibel increase denotes a sound that is 10 times as intense, and a 20-decibel increase denotes a sound that is 100 times as intense. In terms of sound perception, a listener perceives a 10-decibel increase as doubling in loudness and a 20-decibel increase as quadrupling in loudness. So, a listener perceives a 70-decibel sound, like a vacuum cleaner, as half as loud as an 80-decibel sound like a garbage disposal. *Noise Sources and Their Effects*, PURDUE UNIV., https://perma.cc/5T4B-5JC3.

Despite their lower volume, suppressed firearms are still quite "loud." Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 CUMB. L. REV. 33, 35 (2016). Suppressors do not actually silence the discharge of a firearm; they simply reduce the noise that a firearm emits. *Id.* at 36. For example, the 127 decibels generated by a suppressed 9mm pistol are comparable to a firecracker or an ambulance siren, Fligor, *supra*, at 8, and the 132 decibels generated by a suppressed AR-15 rifle are comparable to a jackhammer, *see* Kessler, *supra*. Without the use of suppressors, however, almost all gunshots generate sound greater than 140 decibels. Michael Stewart, *Recreational Firearm Noise Exposure*, AM. SPEECH-LANGUAGE-HEARING

ASS'N (2017), https://perma.cc/DYS7-8AXH. And the CDC warns that even momentary exposure to sounds above that threshold risks hearing loss. *How Hearing Loss Occurs*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://perma.cc/D6BC-96SA.

Accordingly, suppressors are critical components of firearm safety. They are far more effective for mitigating potential hearing damage than personal protective equipment like earplugs or earmuffs, which are susceptible to misuse. *See* Matthew P. Branch, *Comparison of Muzzle Suppression and Ear-Level Hearing Protection in Firearm Use*, 144 OTOLARYNGOLOGY HEAD & NECK SURG. 950, 950 (2011) ("All suppressors offered significantly greater noise reduction than ear-level protection, usually greater than 50% better. Noise reduction of all ear-level protectors is unable to reduce the impulse pressure below 140 dB for certain common firearms, an international standard for prevention of sensorineural hearing loss."). Indeed, the CDC has stated that the "only potentially effective noise control method to reduce . . . noise exposure from gunfire is through the use of noise suppressors that can be attached to the end of the gun barrel." Lilia Chen & Scott E. Brueck, *Noise and Lead Exposures at an Outdoor Firing Range – California*, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, 5 (2011), https://perma.cc/GD82-YSL9.

Unlike personal protective equipment, suppressors also protect *other people*, not just the firearm user, by reducing sound intensity at the source. They may even be more effective at protecting bystanders than they are at protecting users. *See* Edward

Lobarinas et al., *Differential Effects of Suppressors on Hazardous Sound Pressure Levels Generated by AR-15 Rifles: Considerations for Recreational Shooters, Law Enforcement, and the Military*, 55 Int'l J. Audiology S59, S63 (2016) (showing greater reduction in decibels one meter to the left of the muzzle than at the user's right or left ear). This feature is crucial in enclosed settings—such as home-defense situations—where hearing protection may be unavailable and communication is essential.

Suppressors offer critical safety and functionality advantages for self-defense situations. An individual who stores a firearm with a suppressor attached is ensured hearing protection in the event of a late-night home invasion when there is no time to locate or equip earplugs or muffs and the need for hearing protection is at its zenith because the sound of a firearm indoors cannot disperse like it would in an outdoor setting. *See* Scott E. Brueck, et al., *Measurement of Exposure to Impulsive Noise at Indoor & Outdoor Firing Ranges During Tactical Training Exercises*, Nat'l Inst. for Occupational Safety & Health, 10 (2014), https://perma.cc/JX79-KXY3 (At an indoor firing range, "instructors were exposed to more reverberant noise because the shooters were relatively close to the walls and ceiling of the nearby bullet trap."). Suppressors also aid recoil management and reduce muzzle rise, so individuals can more effectively put follow-up shots on target, especially in self-defense scenarios. *See* Wipfler, *supra*; Nunley, *supra*. For this reason, some firearms safety instructors prefer that their students use suppressors when training because it prevents them from developing a flinch when they fire a gun. Kopel*, supra.*

In contrast, suppressors are very rarely used for criminal purposes. Indeed, the Federal Government has acknowledged that suppressors' "beneficial use is overwhelming in relation to their criminal use." Gov'ts Suppl. Resp. to Def's. Petition for Rehearing En Banc at 7, *United States v. Peterson*, No. 24-30043 (5th Cir. May 29, 2025), Dkt. No. 135 ("*Peterson* Gov'ts Suppl. Resp."). "Overall numbers . . . suggest that silencers are a very minor law enforcement problem." Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 W. CRIM. REV. 44, 51 (2007). One study estimated that there are only 30 to 40 suppressor-related federal prosecutions a year compared to roughly 75,000 to 80,000 total prosecutions. *Id.* This includes prosecutions for possession of suppressors that are not registered in accordance with federal law and not any actual misuse. *Id.* And in 2017, ATF Deputy Director Ronald B. Turk acknowledged that suppressors are "very rarely used in criminal shootings." Turk, *supra,* at 6. He also stated that the "change in public acceptance of silencers arguably indicates that the reason for their inclusion in the [National Firearms Act] is archaic and historical reluctance to removing them from the [Act] should be reevaluated." *Id.* Indeed, given that suppressed firearms are still as loud as firecrackers or ambulance sirens, for example, it makes sense that suppressors are not of much use to criminals. *See* Fligor, *supra*, at 8.

## II. Illinois Prohibits and Criminalizes Suppressors, even for the Common Uses of Hearing Protection and Firearm Safety.

Although suppressors are legal to possess in most states and under federal law, the possession of a suppressor in Illinois carries stiff penalties. Illinois makes no

exception for suppressors used for lawful purposes such as hearing protection, safety, or improved self-defense capabilities. Instead, Illinois indiscriminately bans the possession of suppressors, even those lawfully registered under the National Firearms Act.

Specifically, Illinois prohibits the possession of "any device or attachment of any kind designed, used[,] or intended for use in silencing the report of any firearm." 720 ILL. COMP. STAT. 5/24-1(a)(6). A violation of Illinois's suppressor ban generally is a Class 3 felony with a sentence of imprisonment between two and five years. 720 ILL. COMP. STAT. 5/24-1(b); 730 ILL. COMP. STAT. 5/5-4.5-40(a).

## III. Plaintiffs Challenge Illinois's Suppressor Ban under the Second and Fourteenth Amendments.

Plaintiffs Theodore Ray Buck Jr., Larry Morse, Dave Clark, and Carlin Anderson are law-abiding adult citizens who own firearms, reside in Illinois, and wish to possess and use suppressors for lawful purposes. Morse DE42:1, 10–12; Anderson DE1:13. Buck wishes to purchase a suppressor and use it for all its lawful purposes, especially shooting suppressed firearms when target practicing on his property as police have previously visited his property because of the noise caused by Buck's target shooting. Morse DE42:10–11. Morse is a firearms instructor and wishes to purchase a suppressor to use during training sessions and for self-defense in his home. Morse DE42:11–12. Morse suffered hearing loss during his military service and wishes to preserve his hearing by doing all possible things to reduce the impact on his hearing from shooting

firearms. Morse DE42:11. Clark hunts and participates in long-range rifle competitions and wishes to use suppressors to increase safety and effectiveness of his firearms in those activities. Anderson DE1:13. And Anderson wishes to use suppressors to increase the safety and effectiveness of his firearms when hunting and to protect against hearing damage. Anderson DE1:13.

Because the suppressor ban prevents Plaintiffs from possessing and using suppressors for lawful purposes, they filed two separate actions in the Southern District of Illinois against Kwame Raoul, the Illinois Attorney General, and other Illinois officials responsible for enforcement of the suppressor ban (collectively the "State"). Morse DE42; Anderson DE1. Both complaints alleged that the suppressor ban violates the Second and Fourteenth Amendments to the United States Constitution and sought declaratory and injunctive relief. Morse DE42:12–14; Anderson DE1:14–16. Because of the common question of law shared by the two actions, the district court consolidated them. Anderson DE47. The State then moved under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings and argued that the Second Amendment offers no protection for suppressors. Morse DE68.

The district court granted judgment on the pleadings for the State and ruled that the Second Amendment does not protect suppressors because they are not "arms" covered by the plain text of the Amendment. SA:18. The district court acknowledged that it "does not matter" whether the "Framers contemplated the eventual creation of a 'silencer' or any device that would serve to reduce the report of a firearm." SA:8. It

also concluded that it "is not in keeping with the guidance of *Heller* and *Bruen*" to "interpret the Second Amendment's reference to 'arms' illiberally to include only those things essential to the firearm's function." SA:13–14. Yet the district court faulted Plaintiffs for failing to establish that "silencers are modern forms of weapons known to be in use or available in the ratification period." SA:15. And it thus concluded that Plaintiffs' claim fails because they "do not plausibly allege the existence of an archetypal device existing in either the eighteenth or nineteenth centuries to demonstrate prior use or understanding by those living in that time, such that the Framers would have thought [suppressors] to be 'arms.'" SA:18.

## STANDARD OF REVIEW

This Court reviews *de novo* a judgment on the pleadings. *Adams v. City of Indianapolis*, 742 F.3d 720, 727 (7th Cir. 2014). It views the facts in the light most favorable to the nonmovant. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). Judgment on the pleadings is warranted only if there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. *Unite Here Loc. 1 v. Hyatt Corp.*, 862 F.3d 588, 595 (7th Cir. 2017).

## SUMMARY OF THE ARGUMENT

Illinois's suppressor ban regulates conduct covered by the plain text of the Second Amendment under a straightforward application of Supreme Court precedent, and the district court's contrary holding should be reversed. By banning possession of suppressors, the State effectively is banning possession of suppressed firearms—

indeed, suppressing the noise made by a gunshot is a suppressor's reason for being. It thus makes no sense to focus the analysis on a suppressor independent of its function on a firearm. And properly framed, there can be no question that ordinary firearms equipped with suppressors are "arms."

Alternatively, even if the analysis were to focus on suppressors themselves, the Second Amendment nevertheless protects their possession because they affect the operation and functionality of a firearm. Constitutional rights implicitly protect conduct closely related to their exercise. Governments could easily circumvent the Second Amendment if they could simply regulate firearm components or accessories without triggering Second Amendment scrutiny. Accordingly, the Second Amendment covers firearm components and accessories designed to facilitate or affect the use of firearms. Suppressors satisfy that standard because they are designed to facilitate the safe and effective use of a firearm for lawful purposes: protection from temporary disorientation serves a vital self-defense purpose, and suppressors are widely considered the most effective method for preventing hearing damage from the sound of a firearm.

The district court erred in holding that suppressors are entitled to no constitutional protection whatsoever. Although the district court correctly acknowledged that the Second Amendment protects more than just "those things essential to a firearm's function," SA:13–14, and that it is irrelevant whether the "Framers contemplated the eventual creation of a 'silencer,'" SA:8, the district court veered off course when it concluded that the failure to allege an "archetypal device

existing in either the eighteenth or nineteenth centuries" is fatal to Plaintiffs' Second Amendment challenge to Illinois's suppressor ban, SA:18. The Supreme Court has expressly rejected that an item being "a thoroughly modern invention" is a basis for excluding it from the Second Amendment's scope. *Caetano*, 577 U.S. at 412 (citation omitted). The district court's contrary holding cannot be squared with Supreme Court precedent.

Although this Court's *Bevis* decision suggests that there is an additional inquiry to determine whether an item is an "arm" covered by the plain text of the Second Amendment, suppressors easily satisfy that standard too. Suppressors are not predominantly useful for military purposes and they are widely possessed by ordinary citizens for lawful purposes. Millions of law-abiding citizens possess suppressors, which facilitate safety for both firearm users and bystanders and improve firearm accuracy and operation. Suppressors make firearms safer and are rarely used for criminal activity. The plain text of the Second Amendment covers suppressors. And for the same reasons, there is no historical tradition that would justify banning them.

## ARGUMENT

### I.  The Second Amendment's Plain Text Covers the Possession of Suppressors.

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. To determine whether the Second Amendment

protects certain conduct, the first task is to determine whether the Amendment's "plain text" covers that conduct. *Bruen*, 597 U.S. at 17. If it does, the "Constitution presumptively protects that conduct," and the government "must demonstrate" that a regulation of that conduct "is consistent with this Nation's historical tradition of firearm regulation." *Id.* To do so, the government must establish that a "modern regulation is relevantly similar to laws that our tradition is understood to permit" in "how and why the regulation burdens a law-abiding citizen's right." *Schoenthal v. Raoul*, 150 F.4th 889, 907 (7th Cir. 2025) (cleaned up).

The Supreme Court has construed the Second Amendment's plain text broadly to cover all "arms-bearing conduct." *Rahimi*, 602 U.S. at 691. And the original meaning of the term "arms" in the Second Amendment "is no different from the meaning today": "[w]eapons of offence, or armour of defence." *Heller*, 554 U.S. at 581 (quoting 1 SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE 106 (4th ed. 1773) (reprinted 1978)). As a matter of plain text, then, arms include "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* (quoting 1 TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (1771)). This "historically fixed meaning applies to new circumstances." *Bruen*, 597 U.S. at 28. It is not limited "only [to] those arms in existence in the 18th century." *Id.* (quoting *Heller*, 554 U.S. at 582). This "general definition" therefore "covers modern instruments that facilitate armed self-defense," *id.*, regardless of

whether they are "thoroughly modern invention[s]," *Caetano*, 577 U.S. at 412 (citation omitted).

The relevant conduct for purposes of the Second Amendment analysis in this appeal is the possession of a firearm equipped with a suppressor. A suppressor has no purpose other than for use as part of a firearm, so it cannot be divorced from the firearm to which it is affixed for purposes of considering the constitutionality of the suppressor ban. Characterizing the relevant conduct another way would be like concluding that the First Amendment does not protect a sound amplification device simply because it is external to a person's vocal cords and a person can physically speak without one. But the Supreme Court has rejected any such notion, instead holding that the First Amendment covers the use of sound amplification devices. *See Saia v. People of State of New York*, 334 U.S. 558, 561–62 (1948). Just as the First Amendment is implicated when the government "regulat[es] decibels" of speech, *id.* at 562, the Second Amendment is implicated when the government regulates decibels of firearms.

When the Second Amendment inquiry is properly framed in this way, the suppressor ban plainly implicates presumptively protected conduct. The plain text of the Second Amendment covers the possession of a suppressed firearm because a firearm outfitted with a suppressor is an "arm": it is "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581 (citation omitted). A homeowner confronting a late-night intruder can use a suppressed firearm to defend his family while preserving their hearing, avoiding

night blindness from muzzle flash, and maintaining the ability to hear and communicate clearly during those critical moments, without the need for at-the-ear muffling. Because Illinois's ban is a regulation of "arms-bearing conduct," *Rahimi*, 602 U.S. at 691, the district court erred when it concluded that the ban does not implicate the plain text of the Second Amendment.

## II. Alternatively, the Second Amendment's Plain Text Covers Suppressors Because They Are Designed to Facilitate the Use or Affect the Functionality of an Arm.

As explained, the proper way of analyzing Illinois's ban is to ask whether a suppressed firearm is an "arm," which it plainly is. But even if this Court were to disagree and focus on the suppressor itself, the Court would still be required to hold that banning suppressors implicates the plain text of the Second Amendment. As Plaintiffs argued in the district court, Morse DE42:6; Morse DE75:10–11; Morse DE76:13–14, the Second Amendment protects the right to keep and bear arms, and regulating a firearm component or accessory designed to affect the functionality or facilitate the use of a firearm implicates the right to keep and bear arms under well-established constitutional reasoning.

Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis*, 578 U.S. at 26 (Thomas, J., concurring in the judgment). American courts accordingly have long recognized that the "right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in

21

repair." *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 178 (1871); *accord United States v. Miller*, 307 U.S. 174, 180 (1939) ("The possession of arms also implied the possession of ammunition . . . ." (citation omitted)). So too has this Court held that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use" even though the Second Amendment makes no mention of firing ranges or practicing with arms. *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *see also N.Y. State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336, 364 (2020) (Alito, J., dissenting) (the Second Amendment protects "necessary concomitant[s]" to the right to bear arms like training).

The right to keep and bear arms has had an intimate connection with items designed to facilitate the use of arms since the Founding. The Second Amendment's prefatory clause "announces the purpose for which the right was codified: to prevent elimination of the militia." *Heller*, 554 U.S. at 599. Meanwhile, Congress's power to "provide for . . . arming . . . the Militia," U.S. CONST. art. I, § 8, cl. 16, refers to the same militia that the Second Amendment contemplates. *Heller*, 554 U.S. at 596. Exercising that authority, the Second Congress passed the Militia Act of 1792, which required "able-bodied" citizens "provide" themselves with not only a "good musket or firelock" but also a "sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball." Act of May 8, 1792, 1 Stat. 271, 271. In other words, in providing for "arming" the militia,

Congress appropriately required the possession of various items other than firearms because of the way those items facilitated the use of firearms. It should follow that law-abiding citizens when exercising the right to arm themselves must also have the right to possess items designed to affect the functionality or facilitate the use of firearms. *See Mock v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023) (Willett, J., concurring) ("[P]rotected Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms.").

Just as other constitutional rights protect myriad conduct that facilitate their exercise, the Second Amendment does too. Other constitutional rights protect conduct that facilitate their exercise even though that conduct may not be strictly necessary to exercise. The First Amendment protects spending for speech because the "right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise." *McConnell v. FEC*, 540 U.S. 93, 252 (2003) (Scalia, J., concurring in part, concurring in judgment in part, and dissenting in part). The Fifth Amendment due process right requires that a defendant have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" to stand trial. *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). The Sixth Amendment right to counsel protects "the right to use lawfully owned property to pay for an attorney." *Luis*, 578 U.S. at 25 (Thomas, J., concurring). The Fifth and Sixth Amendment rights to a jury trial, to confront one's accusers, and the privilege against self-incrimination protect against unknowing or involuntary guilty

pleas. *Parke v. Raley*, 506 U.S. 20, 28–29 (1992). Because the Second Amendment right "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees,'" *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)), it protects the possession and use of firearm components or accessories designed to affect the functionality and facilitate the use of arms.

These principles confirm that the Second Amendment protects suppressors. When a firearm is fired and a bullet exits the muzzle, the gas from the chamber spherically expands and produces a muzzle blast. Firearm blast sounds range from 140 to 170 decibels. William J. Murphy, et al., *Developing a Method to Assess Noise Reduction of Firearm Suppressors for Small-Caliber Weapons*, 33 PROCEEDINGS OF MEETINGS ON ACOUSTICS 1 (2018), https://perma.cc/4CBE-B9SS. For example, an AR-15 fired without a suppressor, produces a 162-decibel sound, and even a .22-caliber pistol, a very small firearm, produces a sound approximately at the 140-decibel limit. Kessler, *supra*. Some firearms produce sounds that register over 180 decibels at the shooter's ear (or *10,000 times* the pressure at the cutoff for sounds that are safe for any length of time). Colleen G. Le Prell, *An Overview of HPDs, New Legislation, and Recommendations for Rifles with Silencers*, THE HEARING REV. (Nov. 29 2017), https://perma.cc/7434-G8JS. Unsuppressed firearms like these are potentially injurious to both the operator and bystanders as they exceed that 140-decibel threshold for sounds that are safe for even momentary exposure. *See How Hearing Loss Occurs*, *supra*.

Suppressors are designed to facilitate the safe and effective use of arms to which they are affixed. Suppressors reduce the sound that a firearm blast produces by approximately 20 to 30 decibels. Murphy et al., *supra*, at tbl. 2 (showing approximately 20 to 30 decibel reductions for 13 different firearms). Suppressors are a "vastly superior" method of hearing protection compared to personal protective equipment. Branch, *supra*, at 950. "Practical limitations of ear-level devices are myriad. Poor fit, migration of device due to activity or sweat, incorrect use, pain, heat, and loss of communication top the list." *Id.* at 952. Suppressors, unsurprisingly then, are the only method of complete hearing protection that the CDC recommends for firearms. Chen & Brueck, *supra*, at 5.

Suppressors also facilitate the safe and effective use of firearms in several ways beyond their protection for the hearing of the individuals who wield them. First, a suppressor protects *other people*, not just the user. Whether a firearm is fired at a shooting range, from a tree stand while hunting, or in a self-defense situation, the suppressor *globally* reduces the volume of sound produced by a firearm. Suppressors protect all kinds of bystanders: individuals who have removed their earplugs before leaving the range, hunting partners who are listening for game; or nearby family members during a home invasion. Second, because a firearm owner can store his firearm with a suppressor attached, suppressors ensure hearing protection in the event of a home invasion and the need to suddenly repel an attacker with the firearm. Third, suppressors reduce the chance that a firearm owner will be disoriented during a self-defense situation. An

unsuppressed Glock 17's 162-decibel sound, *see Relative Sound Pressure Levels in Decibels (dB) of Firearms*, NAT'L GUN TR. (July 21, 2017), https://perma.cc/J972-2JBE, is comparable to the 170-decibel sound produced by a "flashbang" grenade used to disable someone with light and sound, *How Do Flashbangs Work?*, CHARLOTTE EYE EAR NOSE & THROAT ASSOCS., P.A. (Mar. 11, 2020), https://perma.cc/UP47-CMVG. Noises at that volume can cause temporary deafness and disorientation to the point of loss of balance (because the fluid of the inner ear is disrupted). *Id.* Avoiding disorientation and deafness is *crucial* to effective use of a firearm and highly beneficial in a self-defense situation, and it permits individuals to communicate and coordinate their self-defense activities. Fourth, suppressors reduce recoil and help reduce muzzle flinch, allowing greater control of a firearm and improved accuracy. Wipfler, *supra*; Nunley, *supra*. As the Federal Government has explained, "[a]ll these practical benefits demonstrate that suppressors facilitate the constitutional right to keep and bear arms." *Peterson* Gov'ts Suppl. Resp. at 4–5.

Suppressors are like the firing ranges that this Court has held are protected by the Second Amendment. *Ezell*, 651 F.3d at 704. A firing range provides a place in which the discharge of a firearm is carefully controlled to prevent damage to property or injury to the user or bystanders; a suppressor reduces the sound that a firearm produces to mitigate harm to the hearing of the user or bystanders, especially during the repetitive shooting required for training. *See* Chen & Brueck, *supra*, at 5; Murphy et al., *supra*, at tbl. 2; *How Hearing Loss Occurs*, *supra*. A firing range provides place for firearm owners

to hone their skills for use in potential self-defense situations; suppressors facilitate effective self-defense by reducing recoil, improving accuracy, facilitating communication, increasing situational awareness, and avoiding the possibility of flash-blindness and disorientation. *See Relative Sound Pressure Levels in Decibels (dB) of Firearms, supra; How Do Flashbangs Work?, supra*; Wipfler, *supra*; Nunley, *supra*.

Suppressors also facilitate the protected "training and practice" that occurs at firing ranges. *See Ezell*, 651 F.3d at 704. The noise from firearms is concentrated at firing ranges, especially those set indoors. And the noise from unsuppressed firearms is ordinarily unsafe for any amount of exposure. *See* Murphy et al., *supra*, at 1; *How Hearing Loss Occurs, supra*. Because personal protective equipment offers insufficient protection from firearm noise, Branch, *supra*, at 950, 952, the CDC recommends suppressors as the most complete form of hearing protection, Chen & Brueck, *supra*, at 5. Firearm owners thus cannot exercise their right to train and practice safely without suppressors.

The circumstances of Plaintiffs in this appeal further show how suppressors facilitate the exercise of Second Amendment rights. For example, Anderson has alleged that he currently refrains from hunting because of the suppressor ban but would, if permitted, use suppressors to hunt safely and effectively while mitigating the risk of hearing damage. Anderson DE1:12; *see also Heller*, 554 U.S. at 599 (noting that the Second Amendment protects the right to use firearms for hunting). Anderson would also use suppressors to protect his hearing while target practicing. Anderson DE1:12.

And Morse, who has hearing loss from his military service, desires to use suppressors both in connection with training and for self-defense in the home. Morse DE42:12.

To be sure, a suppressor cannot, by itself, expel a projectile, just as a sound amplifier cannot speak on its own. *See Saia*, 334 U.S. at 561–62 (holding that the First Amendment covers sound amplifiers). Notably, *no single part* of a firearm can expel a projectile on its own. Yet the regulation of other components of firearm functionality such as an ammunition magazine, a rifle barrel, a set of sights, or a trigger is still a regulation of a firearm. *See, e.g., Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) (holding magazines are "arms"); *Duncan v. Bonta*, 133 F.4th 852, 867 (9th Cir. 2025) (acknowledging that a ban on "firearm triggers" would "likely" implicate the Second Amendment); *see also Jackson v. City & County of San Francisco*, 746 F.3d 953, 967–68 (9th Cir. 2014) (holding that hollow-point ammunition is covered by the Second Amendment because of the "corresponding right to obtain the bullets necessary to use [firearms]" (cleaned up)); *Miller*, 307 U.S. at 180 ("The possession of arms also implied the possession of ammunition, and the authorities paid quite as much attention to the latter as the former.").

Nor is it possible to meaningfully distinguish between different components that affect firearm functionality for purposes of Second Amendment analysis. "[W]hether a firearm component is an inherent and 'necessary' part of the arm itself, or instead merely an 'optional' and unnecessary accessory to the arm, is a hopelessly indeterminable and inadministrable distinction." *Duncan*, 133 F.4th at 916 (VanDyke, J.,

dissenting). Despite its other errors, the district court got this point right when it acknowledged that it "is not in keeping with the guidance of *Heller* and *Bruen*" to "interpret the Second Amendment's reference to 'arms' illiberally to include only those things essential to the firearm's function." SA:13–14. "[J]ust as with televisions and sewing machines, there is no such thing as a stock-part basic firearm . . . . There are many parts that constitute the arm, most of which usually can be swapped out to emphasize and improve certain functions over others." *Duncan*, 133 F.4th at 919 (VanDyke, J., dissenting). Case in point: although suppressors are sometimes detachable, they are sometimes *integral* components of a firearm that cannot be removed such as on the SilencerCo Maxim 9, which has a permanently affixed suppressor from the factory. *See Maxim 9 Instruction Manual*, SILENCERCO, https://perma.cc/3VKZ-6CXN. Accordingly, the keeping and bearing of "arms" necessarily includes the possession of any "*functional* component" of an "arm"; otherwise, governments could ban all manner of "arms" simply by regulating their individual components. *Duncan*, 133 F.4th at 919 (VanDyke, J., dissenting).

The district court's decision is inconsistent with the very precedents on which it relied in another important way. The district court correctly acknowledged that it "does not matter" whether the "Framers contemplated the eventual creation of a 'silencer' or any device that would serve to reduce the report of a firearm." SA:8. Yet the district court misapplied that principle when it demanded that Plaintiffs "plausibly allege the existence of an archetypal device existing in the eighteenth or nineteenth centuries to

demonstrate prior use or understanding by those living in that time, such that the Framers would have thought [silencers] to be 'arms.'" SA:18. That is, simply put, not Plaintiffs' burden nor a position that the State advanced in the district court.

Whether suppressors or suppressor precursors existed during the eighteenth or nineteenth centuries is irrelevant to whether they constitute "arms." *See Bruen*, 597 U.S. at 28. It bears repeating that the Second Amendment is not limited "only [to] those arms in existence in the 18th century." *Id.* (quoting *Heller*, 554 U.S. at 582). The district court's contrary conclusion effectively establishes a technological ceiling for the Second Amendment. By the district court's lights, only technological advancements that are sufficiently similar to pre-twentieth-century firearm technology qualify for Second Amendment protection. Suppressed firearms are like the stun guns at issue in *Caetano v. Massachusetts*, where the Supreme Court rejected the argument that stun guns were not in common use at the Founding, calling that argument "inconsistent with *Heller*'s clear statement that the Second Amendment 'extends . . . to . . . arms . . . that were not in existence at the time of the founding.'" 577 U.S. at 412 (quoting *Heller*, 554 U.S. at 582). Just as that argument failed at the outset for stun guns, it fails for suppressors too. In other words, the Second Amendment's protection extends even to "thoroughly modern invention[s]." *Id.* (citation omitted).

But were the existence of a historical analogue to suppressors relevant to whether they are "arms," history establishes that suppressors *do* have historical analogues. Airguns, which were invented near the start of the eighteenth century and used

compressed air instead of gunpowder, were much quieter counterparts to other firearms. Engesser, *supra*. Over time, airguns came into common use for lawful purposes among the ordinary public as they "proved popular for small- and medium-game getting, targeting and even bird shooting." James, *supra*. Like modern suppressors, airguns were relatively quiet but by no means silent. *Id.* And like modern suppressors, airguns limited recoil, a critical feature in self-defense situations. *See* James, *supra* (explaining that testing of "circa-1860 vintage air guns" revealed "nil" to "[s]ome" recoil). Similarly, the "Concealed Lock" mitigated the report of a firearm so that no "Spark of Fire or Smoke [would] arise[]." English Patent No. 1095, *supra*. Like modern suppressors mitigate the report of a firearm to prevent disorientation and flash-blindness, *see Relative Sound Pressure Levels in Decibels (dB) of Firearms*, *supra*; *How Do Flashbangs Work?*, *supra*; Wipfler, *supra*; Nunley, *supra*, the concealed lock mitigated the report of a firearm to avoid "obstruct[ed] . . . Sight," English Patent No. 1095, *supra*.

Although Maxim's technology was new when he invented the first commercially successful suppressor, the underlying principle of a quieter gun or otherwise diminished report was not. There is no basis in the text of the Second Amendment or Supreme Court precedent to distinguish between airguns or concealed locks and firearms equipped with modern suppressors simply because one achieves a relatively quiet shot through the use of compressed air or a diminished report through the use of a concealed firing mechanism and the other through an attachment affixed to the end of the barrel.

Finally, out-of-circuit decisions to the contrary also fail to persuade. The Tenth Circuit, in a sparsely reasoned decision that predates *Bruen*, concluded, without further explanation, that a "silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). Similarly, the Fourth Circuit, in an unpublished decision, stated that a suppressor is a mere "firearm accessory" that "fails to serve a core purpose in the arm's function." *United States v. Saleem*, No. 23-4693, 2024 WL 5084523, at *2 (4th Cir. Dec. 12, 2024). But those decisions are premised on the fallacious "assumption that there is some Platonic ideal of a firearm." *Duncan*, 133 F.4th at 918 (VanDyke, J., dissenting). By that logic, a "magazine is only 'a box that, by itself, is harmless,' a grip could be characterized as just a piece of polymer, a barrel as just a steel tube, and a bullet as just a small hunk of metal." *Id.* at 917. And "that would mean a grip or sighting system is not a protected component of a firearm because those pieces are 'optional components' not strictly necessary to make the gun fire a round." *Id.* Just as the First Amendment does not apply only to certain forms of expression, the "Second Amendment cannot apply only to firearms containing just those parts that a state like [Illinois] deems essential and necessary." *Id.* at 919. Meanwhile, another circuit that faced this question took a more measured approach: the Fifth Circuit assumed without deciding that suppressors are "arms" when it rejected an as-applied challenge to the National Firearms Act registration requirements on its facts. *United States v. Peterson*, 150 F.4th 644, 652–54 (5th Cir. 2025). Indeed, the Federal Government conceded in the Fifth Circuit that the

"Second Amendment protects firearm accessories and components such as suppressors." *Peterson* Gov'ts Suppl. Resp. at 1.

*    *    *

If the Second Amendment's "protection of 'Arms' [did not] extend to their functional components . . . . the Second Amendment would be a shallow right—easily infringed by basic indirect regulation." *Duncan*, 133 F.4th at 897 (Bumatay, J., dissenting). There is no principled basis on which this Court may distinguish which components or accessories are protected and which are not. Because a suppressor affects firearm functionality, it is an "arm" subject to the protection of the Second Amendment.

## III. Suppressors Are Also "Arms" Under this Court's *Bevis* Decision.

The foregoing establishes that the district court erred when it held that Illinois's suppressor ban does not implicate the plain text of the Second Amendment for lack of a sufficient historical precursor. Although that conclusion is sufficient to reverse the district court's order dismissing these actions, this Court's decision in *Bevis*, issued after briefing on the State's motion for judgment on the pleadings was complete, suggests that there may be an additional inquiry to determine whether the plain text of the Second Amendment covers an item: whether it is an item that law-abiding citizens would use for lawful purposes like self-defense or instead an item that is predominantly useful for military purposes or not possessed for lawful purposes. 85 F.4th at 1194. Plaintiffs address *Bevis* out of an abundance of caution.

As an initial matter, the *Bevis* standard should have no part in the plain-text analysis. *Heller* was clear that "the Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms." 554 U.S. at 582 (emphasis added). In other words, the "textual elements" of the Second Amendment "guarantee the individual right to possess and carry *weapons* in case of confrontation." *Id.* at 592 (emphasis added); *see also United States v. Bridges*, 150 F.4th 517, 524 (6th Cir. 2025) (holding that Second Amendment's plain text covers a machinegun because it "is undoubtedly an 'Arm[]' that one can 'keep and bear.'"); *Duncan*, 133 F.4th at 900–01 (Bumatay, J., dissenting); J. Joel Alicea, *Bruen Was Right*, 174 U. PA. L. REV. (forthcoming 2025), https://perma.cc/S8WJ-SSWD (manuscript at 13–14). Thus, any limitations on the possession of weapons that can be carried must be justified by the State as part of *Bruen*'s historical inquiry, not at the initial, plain-text stage. *Bevis* reasoned that the plain text cannot extend so far, since the Court in *Heller* suggested that machineguns could be "dedicated exclusively to military use." 85 F.4th at 1193. But in doing so, the Court did not suggest that machineguns are not covered by the plain text but, rather, that even though machineguns *are* covered by the plain text, their use nevertheless can be restricted consistent with the "historical understanding of the scope of the right." *Heller*, 554 U.S. at 625. Indeed, as a matter of plain text, the Court indicated that both at the founding and today "*all* firearms constituted 'arms.'" *Id.* at 581 (emphasis added).

While *Bevis* is a published decision of this Court, it addressed an appeal of preliminary-injunction orders, and the Court "stress[ed]" that it was conducting "just a

preliminary look at the subject." 85 F.4th at 1197. For law of the case purposes, this Court has established that as a general matter "legal and factual rulings made as part of a preliminary-injunction analysis are not binding upon panels when they later consider the matter on the merits." *Tully v. Okeson*, 78 F.4th 377, 381 (7th Cir. 2023). And if legal rulings at the preliminary-injunction stage do not bind a future panel in the same case, it would make little sense to say that they bind a future panel in a different case under stare decisis principles.

In any event, although this Court should not follow *Bevis*, it ultimately need not decide whether to depart from the *Bevis* standard because Plaintiffs easily satisfy it. In *Bevis*, this Court construed "arms" to mean "[a]rms that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." 85 F.th at 1194.

Suppressors are common arms that ordinary people safely possess for lawful purposes including self-defense. Law-abiding Americans own millions of suppressors. *Suppressor Owner Study*, *supra*. Suppressors reduce the likelihood that an individual will become disoriented or experience temporary deafness while using a firearm. *See Relative Sound Pressure Levels in Decibels (dB) of Firearms*, *supra*; *How Do Flashbangs Work?*, *supra*. They also reduce recoil and muzzle flinch to facilitate greater control and improved accuracy. *See* Wipfler, *supra*; Nunley, *supra*. Those benefits are potentially lifesaving in

self-defense situations where alertness, accuracy, and the ability to communicate with family members or first responders are imperative.

Not only are suppressors safe for use by ordinary people, but suppressors actually improve firearm safety. The CDC recommends suppressors as the most effective method of hearing protection for firearms. Chen & Brueck, *supra*, at 5. Earplugs and earmuffs are prone to misuse and have other limitations that render suppressors a "vastly superior" form of hearing protection. Branch, *supra*, at 950. And suppressors protect not only the user of a firearm but also those nearby—perhaps to an even greater degree. *See* Lobarinas et al., *supra*, at S63 (showing greater reduction in decibels one meter to the left of the muzzle than at the user's right or left ear). Whether training for self-defense situations at a firing range or warding off an attacker inside the home, suppressors improve the safety of firearm users and bystanders or family members alike. And unlike the items at issue in *Bevis* which this Court viewed as military arms because of their rate of fire or effect on the rate of fire, suppressors do not transform firearms into anything like "machineguns [or] military-grade weaponry." 85 F.4th at 1195. Suppressors have universal benefits for common and lawful uses of firearms, especially self-defense and are thus not "predominantly useful in military service." *Id.* at 1194.

Nor are suppressors "weapons that are not possessed for lawful purposes." *Id.* Suppressors are legal to possess and use in 42 states and legal to possess and use (subject to registration requirements) under federal law. Turk, *supra*, at 6. Indeed, as of

December 2024, Americans had lawfully registered 4.5 million suppressors with ATF. *Suppressor Owner Study*, *supra*. Suppressors are very rarely used for criminal purposes with only a tiny fraction of annual federal prosecutions for crimes involving suppressors (including prosecutions in which the only crime was possession of an unregistered suppressor). *See Criminal Use of Firearm Silencers*, *supra*, at 51; Turk*, supra*, at 6. It is also unsurprising that suppressors are not popular for criminal activity because suppressed firearms are still as loud as firecrackers or ambulance sirens and do not help criminals avoid detection. *See* Fligor, *supra*, at 8. What is more, suppressors extend the length and add to the weight of a firearm, therefore reducing its concealability and maneuverability, which are key features of handguns that make them the weapon of choice for armed criminals. *See Heller*, 554 U.S. at 711 (Breyer, J., dissenting).

Because suppressors are common, used for lawful purposes, not dangerous, very rarely used by criminals, and not predominantly military, they are "arms" under the *Bevis* construction of the plain text of the Second Amendment. Having concluded that suppressors are covered by the plain text of the Second Amendment, this Court might ordinarily remand for application of the historical stage of *Bruen*'s analysis. But this Court explained in *Bevis* that the "distinction between military and civilian weaponry [is] useful for *Bruen*'s second step, too." 85 F.4th at 1201. Similarly, this Court explained at *Bruen*'s second step that historic regulations of dangerous and unusual weapons often "limit[ed] weapons where the likely use for the weapon is a violent breach of the peace." *United States v. Rush*, 130 F.4th 633, 643 (7th Cir. 2025). The same facts that establish

that suppressors satisfy the textual threshold of *Bevis* also establish that there is no historical justification to support Illinois's suppressor ban. *See Schoenthal*, 150 F.4th at 906. Regardless how the inquiry is framed—under *Bevis*, *Rush*, or the common-use test that Plaintiffs submit is the proper mode of analysis under *Heller*—suppressors are instruments that increase the safety of firearms and are overwhelmingly used for lawful purposes and thus cannot be banned consistent with the Second Amendment. *See Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 21, 32, 47; Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban Cases—Again*, 2023 HARV. J. L. & PUB. POL'Y PER CURIAM 41 (Sep. 26 2023), https://perma.cc/8RAK-4RSD. Accordingly, the State cannot satisfy its burden to establish that the ban "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Because the "constitutionality of the challenged statutory provision[] does not present factual questions for determination in a trial," this Court should reverse and remand "for the entry of [a] declaration[] of unconstitutionality and [a] permanent injunction[]." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012).

## CONCLUSION

Because Illinois's suppressor ban is inconsistent with the Second and Fourteenth Amendments, this Court should reverse and remand for the entry of a declaration of unconstitutionality and a permanent injunction. At a minimum, this

Court should hold that the district court erred in finding suppressors not covered by the plain text of the Second Amendment and remand for further proceedings.

Dated: November 3, 2025

Stephen D. Stamboulieh
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
Telephone: (601) 852-3440
stephen@sdslaw.us

Alan Alexander Beck
LAW OFFICE OF ALAN BECK
2692 Harcourt Drive
San Diego, CA 92123
Telephone: (619) 905-9105
alan.alexander.beck@gmail.com
*Attorneys for Plaintiffs-Appellants*
*Larry Morse and Theodore Ray Buck Jr.*

Respectfully submitted,

/s/David H. Thompson
David H. Thompson
Peter A. Patterson
Athanasia O. Livas
Jack Tucker
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
Telephone: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
alivas@cooperkirk.com
jtucker@cooperkirk.com

David G. Sigale
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
Telephone: (630) 452-4547
Fax: (630) 596-4445
dsigale@sigalelaw.com
*Attorneys for Plaintiffs-Appellants*
*Carlin Anderson and Dave Clark*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(A) and Circuit Rule 32(c) because it contains 9,633, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(a) because it has been prepared in a proportionally spaced typeface, 14-point Garamond, using Microsoft Word.

Dated: November 3, 2025

*/s/ David H. Thompson*
David H. Thompson
*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF RULE 30(d) COMPLIANCE

I hereby certify that all of the materials required by Circuit Rule 30(a) are included in the Required Short Appendix and that materials required by Circuit Rule 30(b) will be filed in a Separate Appendix to this brief.

Dated: November 3, 2025                          /s/ David H. Thompson
                                                 David H. Thompson

                                                 *Attorney for Plaintiffs-Appellants*

# REQUIRED SHORT APPENDIX

# TABLE OF CONTENTS

**Page**

Memorandum & Order, *Morse, et al. v. Raoul, et al.*, No. 22-cv-02740-DWD
 (S.D. Ill. Sept. 5, 2025), Dkt. 109 ........................................................ SA1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LARRY MORSE and THEODORE     )
RAY BUCK, JR.,               )
                             )
Plaintiffs,                  )
                             )
v.                           )
                             )        Case No. 22-cv-02740-DWD
KWAME RAOUL, in his Official )
Capacity as the Attorney General )
Of Illinois, et. al.         )
                             )
Defendants.                  )
                             )

_____

CARLIN ANDERSON, and         )
DAVE CLARK,                  )
                             )
          Plaintiffs,        )
                             )
vs.                          )        Case No. 23-cv-0728-DWD
                             )
KWAME RAOUL,                 )
BRENDAN F. KELLY,            )
CRAIG MILLER, and            )
BRYAN ROBBINS,               )
                             )
          Defendants.        )

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

This Court is called upon by Plaintiffs to decide whether Illinois' outright ban of

firearm "silencers" infringes upon the Second Amendment rights of its citizens.

Defendants think not and move to summarily dismiss Plaintiffs' complaints via their

Motion for Judgment on the Pleadings. (Doc. 68).  For the reasons explained below, the Court will grant Defendants' motion.

Background

On December 8, 2022, Larry Morse and Theodore Ray Buck, Jr. filed their Amended Complaint against Kwame Raoul, the Illinois Attorney General, Theodore Hampson, State Attorney for Williamson County, Illinois, and Sean Featherstun, State Attorney for Jefferson County, Illinois, in case number 3:22-cv-2740-DWD.  On February 27, 2023, Plaintiffs Carlin Anderson and Dave Clark filed their Complaint against Defendants Kwame Raoul, the Illinois Attorney General, Brendan F. Kelly, the Illinois State Police Director, Craig Miller, the State's Attorney of Cass County, Illinois, and Bryan Robbins, the State's Attorney of Cumberland County, Illinois, in case number 3:23-cv-0728-DWD. Because of common questions of law, these matters were then consolidated by order of this Court on June 15, 2023. (Doc. 64).

Section 5/24-1(a)(6) of the Illinois Criminal Code,  prohibits the possession of "any device or attachment of any kind designed, used or intended for use in silencing the report of any firearm". 720 ILL. COMP. STAT. ANN. 5/24-1(a)(6). Plaintiffs claim that the statute violates their Second Amendment rights and seek injunctive and declaratory relief, along with fees and costs under 42 U.S.C. § 1988. (Doc. 1).

The Plaintiffs indicate they each wish to acquire a silencer. Plaintiff Buck is a holder of a Federal Firearm License, ("FFL") and would, absent the statute, purchase a suppressor appropriately through the ATF process. He enjoys target shooting but the report of his weapon draws the ire of neighbors who call local law enforcement to

2

investigate. (Doc. 8, p. 16). He also claims that if he were to fire the weapon indoors, such as in a setting requiring his self-defense, his hearing would be damaged. (Doc. 8, p. 17). Plaintiff Morse has already suffered hearing loss due to his service in the United States Army and fears that using his firearm without hearing protection, such as in a situation where need for expediency prevents donning of hearing protection, would worsen his hearing loss. He claims also that, as a firearms instructor, the use of a suppressor would assist him in training his class members. He too, absent Illinois law, would acquire a suppressor through lawful means by applying for ATF's permission. (Doc. 8, p. 17-18).

Plaintiff Dave Clark engages in hunting and participates in long-range rifle competitions and would acquire a suppressor but for its ban in Illinois. Carlin Anderson is the owner of a device prohibited by section 5/24-1(a)(6) but cannot possess it in Illinois, so he keeps it outside of the State. (Doc. 1, p. 12-13).

Defendants Raoul, Kelly, Miller, and Robbins generally respond with the contention that the prohibited devices, which they refer to in their briefing and at argument as "silencers" and "suppressors," are not "arms" in a Second Amendment context, nor are they "necessary to the effective use of" arms. (Doc. 68).  As such, they claim that the statute does not offend the Second Amendment. It is on these bases the Defendants move for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

<u>Standards Under Rule 12(c)</u>

Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed— but early enough not to delay trial—a party may move for judgment on the pleadings."

3

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is assessed under the same standard as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See, e.g.*, *Mesa Laboratories, Inc. v. Federal Ins. Co.*, 994 F.3d 865, 867 (7th Cir. 2021). Accordingly, Plaintiffs must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In deciding a motion for judgment on the pleadings, the Court must accept all well-pleaded allegations as true and view the alleged facts in the light most favorable to the non-moving party. *Archer v. Chisholm*, 870 F.3d 603, 612 (7th Cir. 2017).

"Judgment on the pleadings is appropriate when there are no disputed issues of material fact and it is clear that the moving party [...] is entitled to judgment as a matter of law." *Unite Here Local 1 v. Hyatt Corp.*, 862 F.3d 588, 595 (7th Cir. 2017). Further, if an affirmative defense "clearly is established in the pleadings […] and no question of fact exists, then a judgment on the pleadings may be appropriate." 5C ARTHUR R. MILLER & A. BENJAMIN SPENCER, FEDERAL PRACTICE AND PROCEDURE § 1368 (3d ed. 2025); *see also Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (affirming the trial court's granting of a Rule 12(c) motion for judgment on the pleadings on the basis of an unpleaded affirmative defense). However, "when material issues of fact are raised by the answer and the defendant seeks judgment on the pleadings on the basis of this matter, his motion cannot be granted." *Id.*; *see also e.g.*, *Crudup v. Barton*, No. 98 C 1498, 2002 WL 276285, at *4 (N.D. Ill. Feb. 27, 2002).

In ruling on a motion for judgment on the pleadings, the Court may consider "the complaint, the answer, and any written instruments attached as exhibits." *Northern Ind.*

4

*Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 452 (7th Cir. 1998). "Written instrument" is construed broadly to include such things as affidavits, letters, contracts, and loan documents. *Id.* at 453; *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."). The Court may also consider "information that is subject to proper judicial notice," along with additional facts set forth Plaintiffs' briefings opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *see also Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 528 n.8 (7th Cir. 2015).

Ordinarily, Rule 12(d) requires that a Rule 12(c) motion containing materials outside the pleadings must be converted into a motion for summary judgment. However, the Court may consider documents that are attached to a defendant's Rule 12(c) motion if "they are referred to in the plaintiff's complaint and are central to his claim." *Brownmark*, 682 F.3d at 690.

For the reasons stated below, Defendants are entitled judgment as a matter of law because the Plaintiffs have failed to state a claim that is plausible on its face.

## Constitutional Standards

"There is a long tradition of widespread lawful gun ownership by private individuals in this country." *Staples v. United States*, 511 U.S. 600, 610 (1994). That tradition was enshrined at the time of ratification of the Second Amendment: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and

bear Arms, shall not be infringed."[1]  The term "arms" was not defined by the drafters of the amendments.  But we know that whether a device is included in the category of "arms" is not limited to those weapons in use in the eighteenth century. It is accepted that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)).

> The 18th-century meaning [of "arms"] is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as "weapons of offence, or armour of defence." Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."

*Heller*, 554 U.S. at 581 (internal citations omitted).

The dispute here arises from Plaintiffs' initial claim that the prohibited devices are "arms" within the context of the Second Amendment and, accordingly, a citizen using or possessing them deserves the protection of the Second Amendment. Defendants argue that the Plaintiffs are wrong in their interpretation of the Second Amendment, reasoning that the prohibition of such devices does not violate the Constitution because they are not "arms" nor are they necessary to the effective use of arms. (Doc. 68, p. 9-10).  The threshold question is one of interpreting the Second Amendment's use of the term "arms."

---

[1] "There are many reasons why the militia was thought to be 'necessary to the security of a free State.' First, of course, it is useful in repelling invasions and suppressing insurrections. [...] Third, when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *District of Columbia v. Heller*, 554 U.S. 570, 598 (2008).

As a general guide in interpreting this text, "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576 (citing *United States v. Sprague*, 282 U.S. 716, 731 (1931)).

> The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now. Being a grant of powers to a government, its language is general; and, as changes come in social and political life, it embraces in its grasp all new conditions which are within the scope of the powers in terms conferred.

*State of South Carolina v. United States*, 199 U.S. 437, 448 (1905). But this Court remains mindful that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634–35. As Thomas M. Cooley so insightfully, and maybe prophetically, wrote: "A constitution is not to be made to mean one thing at one time, and another at some subsequent time when the circumstances may have changed as perhaps to make a different rule in the case seem desirable." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 54 (1868). Still, the guidance that both *Heller* and *Bruen* provide lead this Court to the conclusion that the Defendants' Motion for Judgment on the Pleadings should be granted.

<u>Discussion</u>

Section 5/24-1(a)(6) reads: "(a) A person commits the offense of unlawful use of weapons when he knowingly […] (6) Possesses any device or attachment of any kind

designed, used or intended for use in silencing the report of any firearm." Violation of Section 5/24-1(a)(6) is a felony. The term "silencing" is not defined by the statute. And the parties do not attempt to define or differentiate the terms "suppressor" and "silencer." A suppressor is "a device that attaches to the muzzle of a firearm and makes the firearm quieter when discharged." *Paxton v. Dettelbach*, 105 F.4th 708, 710 (5th Cir. 2024). 18 U.S.C. § 921(a)(25) defines the terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm." As the Fifth Circuit recently recognized, "[t]hough many use the term 'silencer,' that term 'is a misnomer, in that—despite movie fantasies—a noise suppressor reduces decibels[ ] but does not actually "silence" the discharge of a firearm. Noise may be muffled or diminished, and maybe by only a few decibels at that, but it can still be heard.'" *United States v. Peterson*, No. 24-30043, 2025 WL 2462665, at *2 (5th Cir. 2025) (citing Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 36 (2015)); *see also People v. Alexander*, 613 N.E.2d 385, 387 (Ill. App. Ct. 1993) ("Our interpretation of the section in question is that [section 5/24-1(a)(6)] prohibits silencers, and a silencer does not have to create a complete absence of sound.").

It is not clear that the Framers contemplated the eventual creation of a "silencer" or any device that would serve to reduce the report of a firearm. Originalism would suggest that does not matter. What matters is whether the term "arms," as it was understood by those of colonial times, would have included devices that suppress the volume emitted by a firearm when discharged. Of course, Plaintiffs contend in their pleadings and briefs that silencers are, in fact, "arms" for the purpose of Second

Amendment protection. Plaintiffs argue that silencers are things (objects) that citizens carry (activity) for use in and facilitate self-defense because they mitigate some of the negative effects caused by loud gunfire, including hearing loss and noise pollution. (Doc. 75, p. 4). For support of their position, they point to *Bruen*:

> We have already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century. Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Thus, even though the Second Amendment's definition of "arms" is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.

*New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1, 28 (2022) (citing *Heller*, 554 U.S. at 582) (citing *Caetano*, 577 U.S. at 411-12 as an analogous example involving stun guns) (internal citations omitted).

Plaintiffs take a liberal reading of *Bruen*. They emphasize that instruments, like silencers, that "facilitate armed self-defense" are, indeed, "arms." They conclude that silencers are useful in the activity of self-defense and, therefore, users of them are deserving of Second Amendment protection. But this Court believes that Plaintiffs pay too little attention to the Majority's reference to *Heller* and its teaching that the term "arms" has a historically fixed meaning but that modern versions of those weapons may still be included within the universe of "arms." *See Bruen*, 597 U.S. at 27-28.

First, Plaintiffs Morse and Buck briefly mention that the National Firearms Act defines "firearm" to include "silencer" and the Gun Control Act defines "firearm" to be

"any firearm muffler or firearm silencer." 26 U.S.C. § 5845(a); 18 U.S.C. § 921(a)(3). Of course, these statutes do not suggest that Congress was adopting the definition of "silencer" to be included in the Constitution's universe of "arms." But what cannot be overlooked is the fact that the federal statutes also regulate the use of silencers. So, Congress' use of those terms does not shed helpful light on whether the Framer's would have classified silencers as "arms."

Plaintiffs indicate that they believe "[t]he term 'arms' encompasses the constituent parts that make an 'arm' function as intended," and include within its definition devices such as suppressors. (Doc. 75, p. 5). Plaintiffs do not point to any binding authority for the proposition that silencers are "arms." They do, however, draw attention to how courts have viewed other weapons, component parts, "accessories," and "accoutrements" related to firearms, as well as the activity of recreational use of firearms in support of their proposition.

Tasers and stun guns are recognized by some to be widely used as a means of non-lethal self-defense citizens in forty-five states. *See Caetano*, 577 U.S. at 420 (Alito, J., concurring). The Eastern District Court of New York found nunchakus,[2] which are in the hands of only 65,000 civilians, to be weapons within the classification of "arms." *Maloney v. Singas*, 351 F. Supp. 3d 222, 237-38 (E.D.N.Y. Dec. 14, 2018).

Users of flash suppressors, for example, have been viewed by at least one district court to warrant Second Amendment protection. *Murphy v. Guerrero*, No. 1:14-CV-00026,

---

[2] Also known as "nunchucks," nunchakus are traditional martial arts weapons consisting of two sticks, usually made of wood, connected by a chain or rope.

2016 WL 5508998, at *26 (D. N. Mar. I. Sept. 28, 2016) (unpublished). Similarly, our District Court found that thirty-round large-capacity magazines constitute "arms" because they can serve "legitimate self-defense purposes." *Barnett v. Raoul,* 756 F.Supp.3d 564, 628 (S.D. Ill. Nov. 8, 2024). And, of course, it has been long held that "arms" are not limited to firearms but include ammunition, bayonets, ramrods and other "proper accoutrements." *U.S. v Miller,* 307 U.S. 174, 180-182 (1939). Plaintiffs reason that suppressors and silencers, as accessories in wide use and as a corollary to the "meaningful exercise of the core right to possess firearms," are "arms" under the Second Amendment. *Wilson v. Cook County,* 937 F. 3d 1028, 1032 (7th Cir. 2019); (Doc. 75, p. 11).

On the other hand, Defendants reason that because "silencers" are not used to cast or strike another, do not contain or feed or project ammunition and do not serve any intrinsic self-defense purpose, they are not deserving of Second Amendment quarter. Unfortunately, there is little helpful guidance that addresses the issues presented by Defendants' Rule 12(c) motion.

Defendants rely on the Tenth Circuit case, *United States v. Cox,* in support of their Rule 12(c) motion. The court in *Cox,* however, dedicated only two paragraphs to its consideration of whether the National Firearms Act's regulation of suppressors violates the Second Amendment. *United States v. Cox,* 906 F.3d 1170, 1186 (10th Cir. 2018). It paid less than a paragraph to a historical analysis to reach the conclusions that "[a] silencer is a firearm accessory; it's not a weapon in itself," and because silencers are not "bearable arms," they fall outside the Second Amendment's guarantee. *Id.* It is not readily apparent what evidence of a "historically fixed meaning" that the trial court or the Tenth Circuit

11

considered. Simply assigning a new label to a silencer is of little help to the process of determining whether a silencer is an "arm" for Second Amendment purposes. As Plaintiffs alluded to during oral argument, some suppressors are permanently installed by the manufacturer such that the term "accessory" seemingly loses its usefulness.

Defendants also point to a Maryland District Court case which involved a contest of whether the National Firearms Act, 26 U.S.C. § 5801, et. seq, is unconstitutional in its requirements that silencers be registered. *U.S. v Hasson*, Case No.: GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019). The District Court found that a silencer is neither an arm nor a weapon in that it "does not serve any intrinsic self-defense purpose" because it, apart from being attached to a firearm, cannot cause harm. *Hasson*, 2016 WL 4573424, at *4. District Judge Hazel did conduct an evidentiary hearing during which he received evidence of the "nature, benefits and purposes of silencers, the application process for registering and serializing silencers, and the prevalence of silencers." *Id.*, at *2. He also received expert testimony on a variety of matters surrounding the use of silencers. *Id.* He seems to have given significant weight to the testimony he received to the effect "you can't hurt anybody with a silencer unless you hit them over the head with it." *Id.* Judge Haley noted that while silencers are useful, they are not "'so critical' to firearm ownership that firearms cannot be used effectively without them." *Id.*, at *5. Respectfully, there is nothing in *Heller* that suggests it is only firearm ownership, and not firearm use, that implicates the Second Amendment. However, in fairness to Judge Haley, he did not have the guidance of *Bruen* at the time he conducted the evidentiary hearing in 2019 and

erroneously applied the "means end scrutiny" analysis. *Id.*, at \*4. As far as the reported case reflects, he did not conduct any meaningful historical meaning inquiry.[3]

Defendants do, however, accept as uncontroversial the notions that "the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to 'arms' does not apply 'only to those arms that existed in the 18th century.'" *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582). They nevertheless maintain that Plaintiffs make too much of *Bruen's* reference to the scope of the definition of "arms" to include "modern instruments that facilitate armed self-defense." (Doc. 68, p. 9). Defendants prefer a narrow reading of *Bruen*. (Doc. 68, p. 5).

Defendants are joined by some courts that also interpret the Second Amendment's reference to "arms" illiberally to include only those things essential to the firearm's

---

[3] Defendants also cite several cases for the proposition that silencers are not "arms." (Doc. 68, p. 5). However, none engaged in an inquiry into the extent to which silencers facilitate the operation of weapons in self-defense. *United States v. Al-Azhari*, Case No. 8:20-cr-206-T-60AEP, 2020 WL 7334512, at \*3 (M.D. Fla. Dec. 14, 2020) (applying the means-end scrutiny test, stating that "the reviewing court considers whether the restricted activity is within the scope of protection of the Second Amendment. If so, the court then applies 'an appropriate form of means-end scrutiny.'"); *United States v. Royce*, Case No. 1:22-cr-130, 2023 WL 2163677, at \*4 (D.N.D. Feb. 22, 2023) ("A silencer is not necessary to make a firearm operable. Rather, a silencer is simply a means to reduce sound omitted from a firearm."); *United States v. Saleem*, 659 F.Supp.3d 683, 698 (W.D.N.C. Mar. 2, 2023) ("A firearm is effective as a weapon of self-defense without the use of a silencer, but the reverse is not true; a silencer serves no purpose without a firearm."); *United States v. Villalobos*, Case No. 3:19-cr-00040-DCN, 2023 WL 3044770, at \*13 (D.Idaho Apr. 21, 2023) ("Because the [S]econd [A]mendment does not explicitly or implicitly protect Villalobos's right to own a silencer, the Court need not reach the historical inquiry.").

13

function. The Ninth Circuit reads the Second Amendment so strictly that it concluded that only those components necessary for the function of the weapon receive the Amendment's protection. See *Duncan v. Bonta*, 133 F.4th 852, 867 (9th Cir. 2025) ("By choosing to protect the right to bear 'arms,' not 'arms and accoutrements,' the Founders constrained the scope of the Second Amendment. The term 'Arms' thus encompasses most weapons used in armed self-defense, and the Second Amendment necessarily protects the components *necessary* to operate those weapons. But it does not protect the right to bear accoutrements.")(emphasis added).[4] Thus, in the view of the Ninth Circuit in *Duncan*, no attachment, accessory, or accoutrement, regardless of its increased efficiency,  its safety enhancements, or historical availability is protected. *Duncan*, 133 F.4th at 869.

That view is not in keeping with the guidance of *Heller* and *Bruen*. By illustration, while it is true the Second Amendment does not specifically mention a sighting device, it is somewhat imperceptive not to recognize that the Second Amendment loses all meaning if the conclusion is that a sight, despite its obvious efficiency and safety attributes, is not included in the meaning of "arms" because it is not *necessary* to the functioning of the firearm. A First Amendment equivalent of that approach would be to ban modern forms of communication like the internet and social media despite their being more efficient and effective than the means utilized by the eighteenth century town crier or the

---

[4] It is curious whether such a restrictive understanding would survive application during First Amendment considerations such that it would extend the freedom only to the right of the speaker to speak, but not necessarily to speak in a manner to be heard or understood.

publisher of *The Pennsylvania Packet and Daily Advertiser*.[5] *Bruen* teaches that even technological improvements to "arms" that enhance means of lawful self-protections, though not  envisioned or imagined by the Framers, may still implicate the Second Amendment.

Likewise, it is not enough for Plaintiff to draw only on *Bruen's* conclusion that the "general definition [of 'arms'] covers modern instruments that facilitate armed self-defense". Such a reading *Bruen* would effectively remove all bounds to the definition of "arms" so long as the device conceivably could be used in self-defense.  To reach Plaintiffs' conclusion one must ignore *Bruen's* finding that "the Second Amendment's definition of 'arms' is fixed according to its historical understanding." *Bruen*, 597 U.S. at 28.  At the same time, it is not particularly helpful to simply categorize "silencers" as mere "accessories" and pass by any meaningful discussion of what constitutes "arms." *See Cox*, 906 F.3d at 1186 (finding silencers to be mere "accessories").

The difficulty with the Plaintiffs' contention that silencers are "arms" is that, unlike an AR-15 or AK-47 rifle, for example, Plaintiff has not shown that silencers are modern forms of weapons known to be in use or available in the ratification period.  The Plaintiffs' Complaints and the record are devoid of any reference to a time in the history of our country where any early generation device, accessory or attachment was broadly employed to reduce the report of a firearm.  Put another way, Plaintiffs offer nothing to suggest there is a fixed historical understanding that devices which serve only to enhance

---

[5] Colonial era newspaper famous for printing and circulating to the citizens of the colonies many copies of the then proposed Constitution.

operation of a firearm by reducing its reports are "arms" themselves. Simply, if there was no colonial-era or antebellum-period archetype to a modern-day silencing device, it is difficult to understand how the Framers would have understood the ordinary meaning of the word "arms" to include a device that reduces the report of a firearm.

At the same time, some attachments are so integral to the effective operation of a firearm that they might be logically included within the historically fixed understanding of "arms." For example, and as mentioned earlier, there have been seemingly significant technological advances in firearm aiming technology, from periods where no sighting device was used, progressing to traditional "iron sights" and then evolving to the modern era of sophisticated optical sights which are now apparently widely used because they facilitate more precise aiming. The same can be said about modern magazines that now allow the ammunition to be fed into battery much more quickly and efficiently than each cartridge (or ball, wad and powder) could be inserted by hand.  While some may argue sights or large capacity magazines are just accessories because they are not essential to the "ownership" or "function" of the firearm, such attachments might be considered "arms" because they are modern versions of historically utilized firearm components. One can readily trace the technological advances that have been made over the past several centuries where improvements, modifications, and innovations have been made to or based upon the colonial-era firearms and their accessories and attachments. From the age of the flintlock and wheel lock pistols in the 1700s to the revolver in the 1800s and to the innovation of semi-automatic pistols in the early 1900s, all are the result of improvements and engineering changes made to what some believe was first "pistol"

16

invented by Caminelleo Vitalli in Italy in 1540. *See generally*, Arcadi Gluckman, *United States Martial Pistols and Revolvers: A Reference and History* (1937). Thus, firearm sights, methods of and devices for "charging" the weapon, and handheld pistols themselves have long historical lineages. But the same cannot be said of silencers. Plaintiffs do not point to a colonial-era or civil war years progenitor of a "silencer" or any device that was employed to reduce report of a firearm; nor has there been, apparently, a period of evolution in silencer technology beginning in the eighteenth, or for that matter, the nineteenth century.[6]

Nevertheless, Plaintiffs argue that silencers, as relatively modern instruments, enhance the efficiency and effectiveness of certain firearms by facilitating armed self-defense in that they improve accuracy, reduce recoil and diminish the report of the weapon used, all of which is particularly useful when the firearm is operated within an enclosed structure, such as a home. (Doc. 75, p. 3-6).[7] The Court accepts those statements as true. Neither does the Court seriously question the truth of the Plaintiffs' allegations that silencers have become popular among law-abiding citizens of other states and are rarely used in carrying out criminal activity. These are all seemingly worthwhile attributes and useful enhancements to the safe operation of a firearm, and, if legislatively

---

[6] Hiram Percy Maxim designed the "Maxim Silencer" in the early 1900s and received his patent in 1909. He made it available to the public in 1912. Wm. Brophy, *Marlin Firearms: A History of the Guns and the Company That Made Them* 654 (1989).

[7] Interestingly, despite expending a fair amount of ink showcasing the usefulness of silencers, the Anderson Plaintiffs admonish this Court that "there is no warrant in the plain text of the [C]onstitution, or in Supreme Court precedent, for this Court to make the call of how useful is useful enough to warrant Second Amendment protections." (Doc. 76, p. 12). This Court agrees that it should not, nor will it, engage in such a "balancing" test or analysis.

approved, might improve the chances that a law-abiding citizen will survive an encounter that requires reciprocal use of deadly force in her own home.

But as useful, and maybe even sound and wise, it is to permit their possession and use, Plaintiffs have not made a plausible claim that silencers are "arms" as that term was understood in the eighteenth century. A silencer, as it is described by Plaintiffs, does not share characteristics or attributes of, or connections to, "arms" in the historical or traditional sense. In other words, they do not plausibly allege the existence of an archetypal device existing in either the eighteenth or nineteenth centuries to demonstrate prior use or understanding by those living in that time, such that the Framers would have thought them to be "arms".    And, importantly, Plaintiffs offer no authority to demonstrate that because a device can accompany or be used in conjunction with the basic firearm, it is, whether attached or not, an "arm" for the purposes of the Second Amendment.

## Conclusion

Plaintiffs rely on their Complaints to place before this Court the evidence they claim they need to make their claims plausible for purposes of a Rule 12(c) motions. (Doc. 106, p. 39).  The parties agree that there are no factual disputes. (Doc. 106, p. 19). However, as noted, nothing in the pleadings demonstrates the existence of a historical precursor to a silencer that would show prior use or understanding by those living near the time when the Second Amendment was ratified. As a result, Plaintiffs have failed to plead a plausible claim and Defendants are entitled to judgment as a matter of law. Accordingly, Defendants Motion for Judgment on the Pleadings is **GRANTED**.

Judgement is hereby entered in favor of the Defendants and against the Plaintiffs.

Clerk is DIRECTED to close the case.

**SO ORDERED.**

Dated: September 5, 2025

_____
DAVID W. DUGAN
United States District Judge

19

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on November 3, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ David H. Thompson
David H. Thompson
*Attorney for Plaintiffs-Appellants*