# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

CARLIN ANDERSON, et al.,

*Plaintiffs-Appellants,*

v.

KWAME RAOUL, in his official capacity
as Attorney General of Illinois, et al.,

*Defendants-Appellees.*

LARRY MORSE, et al.,

*Plaintiffs-Appellants,*

v.

KWAME RAOUL, in his official capacity
as Attorney General of Illinois, et al.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS (No. 23-cv-00728)
HONORABLE DAVID W. DUGAN

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

Stephen D. Stamboulieh
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
Telephone: (601) 852-3440
stephen@sdslaw.us

Alan Alexander Beck
LAW OFFICE OF ALAN BECK
2692 Harcourt Drive
San Diego, CA 92123
Telephone: (619) 905-9105
alan.alexander.beck@gmail.com

*Attorneys for Plaintiffs-Appellants
Larry Morse and Theodore Ray Buck Jr.*

David H. Thompson
  *Counsel of Record*
Peter A. Patterson
Athanasia O. Livas
Jack Tucker
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
dthompson@cooperkirk.com

David G. Sigale
Law Firm of David G. Sigale, P.C.
55 West 22nd Street, Suite 230

Lombard, IL 60148
Tel: (630) 452-4547
Fax: (630) 596-4445
dsigale@sigalelaw.com

*Attorneys for Plaintiffs-Appellants
Carlin Anderson and Dave Clark*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................................................ii

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 3

    I.    Possession of a Suppressor Is Arms-Bearing Conduct Under the Plain Text of the Second Amendment. ............................................................................ 3

    II.    Alternatively, the Second Amendment Covers Suppressors Because They Are Designed to Facilitate the Use or Affect the Functionality of an Arm. ................................................................................................................ 8

    III.    This Court Should Reverse and Remand for Entry of Judgment for Plaintiffs. ............................................................................................................ 19

CONCLUSION ........................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Bevis v. City of Naperville,*
    85 F.4th 1175 (7th Cir. 2023) ...................................................................2, 3, 4, 20

*Citizens United v. FEC,*
    558 U.S. 310 (2010)........................................................................................ 10

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)............................................................... 4, 5, 9, 17, 18

*Drummond v. Robinson Township,*
    9 F.4th 217 (3d Cir. 2021) ............................................................................ 14

*Duncan v. Bonta,*
    133 F.4th 852 (9th Cir. 2025) ............................................................1, 2, 8, 9, 11

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011)........................................................................ 13

*John K. MacIver Inst. for Pub. Pol'y v. Evers,*
    994 F.3d 602 (7th Cir. 2021).................................................................. 10, 11

*Katz v. United States,*
    389 U.S. 347 (1967)........................................................................................ 3

*Lovell v. City of Griffin,*
    303 U.S. 444 (1938)................................................................................ 11, 15

*Mock v. Garland,*
    75 F.4th 563 (5th Cir. 2023) ....................................................................... 12

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012)....................................................................2, 3, 20, 21

*New York State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022)...........................................................................1, 3, 20

*Oakland Tactical Supply, LLC v. Howell Township,*
    103 F.4th 1186 (6th Cir. 2024) .............................................................. 13, 14

*Ortega v. Grisham,*
    148 F.4th 1134 (10th Cir. 2025) ................................................................. 14

*Rocky Mountain Gun Owners v. Polis,*
    121 F.4th 96 (10th Cir. 2024) ..................................................................... 14

*Saia v. New York*,
334 U.S. 558 (1948)............................................................2, 7, 10

*United States v. Alvarez*,
638 F.3d 666 (9th Cir. 2011)...................................................... 6

*United States v. Cox*,
906 F.3d 1170 (10th Cir. 2018).................................................. 4

*United States v. DeBorba*,
No. 24-3304, 2026 WL 1587553 (9th Cir. June 3, 2026) .................................. 18

*United States v. Gomez*,
159 F.4th 172 (2d Cir. 2025)...................................................... 6

*United States v. Rahimi*,
602 U.S. 680 (2024)............................................................ 1, 3

*United States v. Rush*,
130 F.4th 633 (7th Cir. 2025) ................................................ 4, 20

*United States v. Saleem*,
No. 23-4693, 2024 WL 5084523 (4th Cir. 2024)...................................... 4

*United States v.* Scheidt,
103 F.4th 1281 (7th Cir. 2024) ................................................ 6

*United States v. Vereen*,
152 F.4th 89 (2d Cir. 2025)...................................................... 13

*Yee v. City of Escondido*,
503 U.S. 519 (1992).............................................................. 19

**Constitutional Provisions and Statutes**

U.S. CONST. art. I, § 8
cl. 18................................................................................ 11
cl. 16................................................................................ 11

Act of May 8, 1792, 1 Stat. 271 .................................................. 11

**Other Authorities**

Lilia Chen & Scott E. Brueck, *Noise and Lead Exposures at an Outdoor Firing Range –
California*, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH (2011),
https://perma.cc/GD82-YSL9 .................................................. 16

Matthew P. Branch, *Comparison of Muzzle Suppression and Ear-Level Hearing Protection in
Firearm Use*, 144 OTOLARYNGOLOGY-HEAD & NECK SURG. 950
(2011).............................................................................. 16

First Am. Compl., *United States v. District of Columbia*, Case No. 1:25-cv-04458-APM (D.D.C. May 14, 2026), ECF No. 28.................................................................... 15

Gov'ts Suppl. Resp. to Def.-Appellant's Pet. for Reh'g En Banc, *United States v. Peterson*, No. 24-30043 (5th Cir. May 29, 2025), ECF No. 135 ...................... 14, 15

Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 CUMB. L. REV. 33 (2016) ................................................................ 19

*Integrally Suppressed Weaponry*, SUPPRESSORS BY PHOENIX, https://perma.cc/2GUV-LU2A ............................................................................................................... 10

David Kopel, *The Hearing Protection Act and 'Silencers,'* WASH. POST (June 19, 2017), https://perma.cc/FYQ7-D7E3........................................................................ 16, 17

William J. Murphy & Randy L. Tubbs, *Assessment of Noise Exposure for Indoor and Outdoor Firing Ranges*, 4 J. OCCUPATIONAL & ENV'T HYGIENE 688 (2007) .............................................................................................................. 16, 17

Michael Stewart, *Recreational Firearm Noise Exposure*, AM. SPEECH-LANGUAGE-HEARING ASS'N (2017), https://perma.cc/ME65-E5XB .................................. 16

U.S. COURT OF APPEALS FOR THE NINTH CIRCUIT, *Dissent video in 23-55805 Duncan v. Bonta* (YouTube, Mar. 20, 2025), https://www.ca9.uscourts.gov/media/23-55805/opinion ................................... 8

# INTRODUCTION

The State's response brief confirms that the State cannot establish that its suppressor ban is consistent with the Nation's historical tradition of firearm regulation, so the State's only hope is to make hash of the text of the Second Amendment. This Court should reject the State's mistaken efforts.

First, the State largely ignores what *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), require. The correct inquiry is whether the "Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. That is, the text is implicated when the government "regulates arms-bearing conduct." *Rahimi*, 602 U.S. at 691. That focus on conduct cannot support the State's desire to remove conduct from the equation and instead focus solely on suppressors as hollow tubes. Suppressors have no purpose save for their use with firearms. Were it not for that use, the State would not regulate them. When the State criminalizes the possession of an object whose only purpose is to use as part of a firearm, the State necessarily regulates how citizens exercise their right to keep and bear arms.

Second, even if the Court were to examine suppressors independent of arms-bearing conduct, the State's insistence that the Second Amendment's plain text covers only firearm components that are strictly necessary to the exercise of the right cannot be the correct standard. No firearm component is strictly necessary, and alternatives always exist. So, the State's proposed standard, modeled after the Ninth Circuit's

1

decision in *Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) (en banc), is hopelessly inadministrable. The Supreme Court has never limited the First Amendment to only what is strictly necessary to convey a message and has instead recognized that the First Amendment covers items designed to facilitate expression. *See Saia v. New York*, 334 U.S. 558, 559–61 (1948). The same principle applies in the Second Amendment context. *See Bruen*, 597 U.S. at 70 ("The constitutional right to bear arms in public for self-defense is not 'a second-class right,' subject to an entirely different body of rules than the other Bill of Rights guarantees." (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality op.))). The proper standard is thus whether an item is designed to facilitate the use or affect the functionality of an arm.

Third, the State's silence regarding Plaintiffs' argument that suppressors satisfy the standard applied in this Court's decision in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), speaks volumes about the State's prospects at *Bruen* part two. The State's principal response is that *Bevis* is not before the Court, but that argument ignores that *Bevis* was decided after briefing below and that the *Bevis* question is, in any event, related to the plain-text issue that this Court must decide. Suppressors easily satisfy *Bevis* because they are commonly possessed for lawful purposes by millions of Americans; they do not transform firearms into military weapons; and they are rarely used in crime. Because the same legislative facts that establish that suppressors satisfy *Bevis* foreclose any historical-tradition defense, this Court should reverse and remand with instructions

to enter judgment for Plaintiffs as it did in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).

## ARGUMENT

**I. Possession of a Suppressor Is Arms-Bearing Conduct Under the Plain Text of the Second Amendment.**

The State's argument that the correct inquiry is whether a suppressor, by itself, is an "arm" is at odds with Supreme Court precedent. Similar to how the Fourth Amendment protects "people, not places," *Katz v. United States*, 389 U.S. 347, 351 (1967), the Supreme Court has repeatedly looked to an individual's conduct to analyze the Second Amendment's protections. *Bruen* requires that courts ask whether the "Second Amendment's plain text covers an individual's conduct," and if it does, the "Constitution presumptively protects that conduct." 597 U.S. at 24. *Rahimi* reiterated the point, describing what falls within the plain text of the Second Amendment as "arms-bearing conduct." 602 U.S. at 691. Here, the possession of a suppressor is a necessary component of arms-bearing conduct: possessing and carrying a suppressed firearm and thus engaging in hearing-safe use of a firearm when at-the-ear protection is unavailable, inadequate, or undesirable. Accordingly, possession of a suppressor falls within the plain text of the Second Amendment.

The State contends that other authorities limit the relevant question to whether a suppressor is, by itself, an "arm." Appellees' Br., Doc. 34 at 13–14 (May 4, 2026) ("Resp.Br."). Those authorities do no such thing. This Court's decision in *Bevis* did not

3

ask, as the State suggests, whether an ammunition magazine could, by itself, be used to "cast at or strike another." 85 F.4th at 1193 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008)). Although *Bevis* incorrectly asked whether AR-15s and magazines exceeding ten rounds may be reserved for military use to determine whether they fall within the Second Amendment's plain text, Appellants' Br., Doc. 18 at 34 (Nov. 3, 2025) ("Opening.Br."), *Bevis* applied the same analytical framework to magazines as it did to AR-15s, 85 F.4th at 1195. It did not simply declare that magazines exceeding ten rounds were not covered by the Second Amendment because they cannot themselves be used to "cast at or strike another." *Id.* at 1193 (quoting *Heller*, 554 U.S. at 581). And although this Court asked in *United States v. Rush* whether short-barreled rifles were "within the scope of 'arms' that individuals are entitled to 'keep and bear,'" 130 F.4th 633, 638 (7th Cir. 2025), it does not follow that the only question is whether an item may be used to "cast at or strike another." If that were the sole inquiry, absurd results would follow such as the possession of ammunition not being arms-bearing conduct. The State's reliance on *United States v. Cox* and *United States v. Saleem* is similarly unpersuasive as both decisions failed to focus on "arms-bearing conduct" and instead simply asked if a suppressor, standing alone, is "capable of casting a bullet," *United States v. Saleem*, No. 23-4693, 2024 WL 5084523, at *2 (4th Cir. 2024), or used to "cast at or strike another," *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (quotation marks omitted).

The State's argument that a suppressor cannot, on its own, be used to "cast at or

4

strike another" reads *Heller* too narrowly. *Heller* defines arms as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581 (citation omitted). *Heller*'s reference to "any thing that a man wears for his defence" establishes that "arms" covers far more than just items that, alone, are used to "cast at or strike another." What is more, a suppressor is a "thing that a man . . . takes into his hands . . . to cast at or strike another." *Id.* Most "arms" are comprehensive systems of "thing[s]" designed for the purpose of casting at or striking another. Only by ignoring that *Heller* refers to "any thing" that a man "takes into his hands" for this purpose is the State able to isolate "cast at or strike another." But by the State's logic, neither the hilt of a sword nor the handle of a pike is an "arm" because only the blades of those weapons do the cutting.

The State's "gerrymandering" charge likewise cannot be sustained, as it is the State, not Plaintiffs, that tries to redraw the relevant inquiry. The State fails to address the fact that a suppressor has no purpose other than for use as part of a firearm. *See* Opening.Br.20; Resp.Br.11. The State instead removes firearms from the picture, asks whether the leftover hollow tube is an "arm," answers no, and announces that the Second Amendment has nothing to do with this appeal. Resp.Br.11. That move ignores that the State would have no reason to regulate suppressors but for their use as part of a firearm. Perhaps the State's desperation to convert the plain-text inquiry into a word game reflects that the State cannot otherwise identify a historical analog to justify its suppressor ban. But when the State criminalizes the possession of an object that exists

5

only to be used with a firearm, it is regulating *how citizens use their arms.* That is arms-bearing conduct.

For that reason, the State's principal authorities for its "level of generality" argument do not help the State. *United States v. Scheidt* involved a challenge to a prohibition on making false statements "in connection with the acquisition . . . of any firearm." 103 F.4th 1281, 1283 (7th Cir. 2024) (quoting 18 U.S.C. § 922(a)(6)). This Court explained that this "truth-telling requirement" implicated the Second Amendment "[o]nly in the most indirect way—and even then, too indirectly." *Id.* at 1284. Lies have a robust existence apart from firearms, as they "are an integral part of human intercourse." *United States v. Alvarez,* 638 F.3d 666, 673 (9th Cir. 2011) (Kozinski, C.J., concurring in the denial of rehearing en banc). The possession of a suppressor, however, has no purpose apart from its use with a firearm, so its possession is part of a course of arms-bearing conduct. Similarly, the Second Circuit held in *United States v. Gomez* that possessing a firearm with an obliterated serial number did not implicate the Second Amendment because the presence of a serial number "in no way impair[s]" the ability to "possess and carry a serialized firearm for self-defense." 159 F.4th 172, 177 (2d Cir. 2025). Like the false statement in *Scheidt* but unlike a suppressor, a serial number does not affect the functionality of a firearm, so *Gomez* is also inapposite, regardless of whether it was correctly decided. Concluding that the plain text of the Second Amendment presumptively covers components designed to affect or facilitate the use of firearms would not, as the State suggests, somehow bring the distribution of

drugs—independent conduct again unrelated to the exercise of the right—within the scope of the Second Amendment. *Contra* Resp.Br.14.

Plaintiffs' First Amendment analog is further confirmation that the possession of suppressors is arms-bearing conduct. The State makes the puzzling assertion that the "sound amplification devices at issue in *Saia* were necessary to the exercise of the First Amendment right to freedom of speech." *Id.* at 16. They were not. The preacher in *Saia* mounted a loudspeaker to his car to drive around and spread his message. 334 U.S. at 559. He could have instead driven with his windows down and yelled out that same message—or used any other form of non-amplified oral or written communication. Not only were the sound-amplification devices not necessary to the preacher's message, they also were not themselves speech. But because they facilitated expression, the First Amendment nevertheless covered their use. *See id.* at 560–61.

At bottom, the State's broader complaint that Plaintiffs' framing would push every challenge past *Bruen*'s first step is unfounded. Ruling that possession of an object whose only function is to alter how a firearm operates is arms-bearing conduct would not entail that any conduct incidentally connected to a firearm implicates the Second Amendment. The standard Plaintiffs propose is precise and consistent with *Bruen* and *Rahimi*.

## II. Alternatively, the Second Amendment Covers Suppressors Because They Are Designed to Facilitate the Use or Affect the Functionality of an Arm.

Even if this Court focuses on suppressors independent of arms-bearing conduct, Plaintiffs have the better argument about the extent to which the Second Amendment covers firearm components. The State's necessity theory is incoherent and inconsistent with precedent and history, and it would render the Second Amendment a "shallow right—easily infringed by basic indirect regulation." *Duncan*, 133 F.4th at 897 (Bumatay, J., dissenting). The proper standard is whether an item is designed to facilitate the use or affect the functionality of an arm. Suppressors readily satisfy that standard.

A. Begin with administrability. The State frames the test as whether an item is "necessary for the ordinary functioning of a firearm." Resp.Br.21 (quoting *Duncan*, 133 F.4th at 866 (majority op.)). That test admits of no principled application because no firearm component is strictly necessary. U.S. COURT OF APPEALS FOR THE NINTH CIRCUIT, *Dissent video in 23-55805 Duncan v. Bonta*, at 7:35–8:02 (YouTube, Mar. 20, 2025), https://www.ca9.uscourts.gov/media/23-55805/opinion. Scopes or red dot optics are not "necessary"; users could instead use iron sights. *Id.* at 8:05–10:05. But even iron sights are not strictly "necessary." Indeed, no aiming device is strictly necessary; firearm users could simply point and shoot. Similarly, an automatic cycling mechanism of the type used in common semiautomatic firearms is not "necessary" for the use of a firearm; users could instead use a revolver mechanism, a lever action, a pump action, or a single-shot break action. *Id.* at 16:20–17:45. Distinguishing between

"inherent and 'necessary' part[s] of the arm itself, or instead merely an 'optional' and unnecessary accessory to the arm, is a hopelessly indeterminable and inadministrable distinction" and requires courts to opine on the nonexistent "Platonic ideal of a firearm." *Duncan*, 133 F.4th at 916 (VanDyke, J., dissenting). Relegating protected arms to only the most basic, rudimentary firearm technologies in pursuit of that Platonic ideal is also inconsistent with *Heller*'s rejection of the borderline "frivolous" argument that the Second Amendment does not protect modern firearm technology. 554 U.S. at 582.

The State dismisses these arguments as those of a dissenter and contends that the Ninth Circuit had "no difficulty applying" a necessity rule in *Duncan*. Resp.Br.21. But the *Duncan* majority's application of the necessity rule vindicates the dissent's criticisms, as it draws incoherent distinctions wholly ungrounded in the Second Amendment's text. For example, the Ninth Circuit concluded that the "Second Amendment's text necessarily encompasses the corollary right to possess a magazine for firearms that require one," *Duncan*, 133 F.4th at 867–68 (majority op.)—just not a "large-capacity" magazine. So, in the Ninth Circuit's view, a magazine of *some* size is protected by the Second Amendment's plain text, but a magazine the state (wrongly) deems "large-capacity" is not. Where that distinction can be found in the text of the Second Amendment is a mystery.

The same administrability problems plague application of the State's necessity rule to suppressors. Suppressors are as much a technology that affects firearm functionality as they are a distinct firearm part. Indeed, some firearms are sold with

9

permanently affixed suppressors, Opening.Br.29, and others have suppressor technology built into the barrel (i.e., integrally suppressed firearms), *Integrally Suppressed Weaponry*, SUPPRESSORS BY PHOENIX, https://perma.cc/2GUV-LU2A. One could argue that under *Duncan*'s reasoning the Second Amendment's text would encompass these built-in suppressors but not detachable ones. As explained below, that would not be a proper application of *Duncan* (after all, *Duncan* suggested that magazines of some sort are protected for magazine-fed firearms regardless of whether they are detachable), but the fact that this would be a dispute illustrates how far the *Duncan* test strays from the plain meaning of the Second Amendment's text.

Next consider precedent. Plaintiffs' proposed standard is consistent with how the Supreme Court has analyzed questions across other constitutional provisions. The State suggests that the First Amendment protects political expenditures because they are necessary for speech. Resp.Br.19–20. Not so. Political expenditures facilitate freedom of speech by increasing the "quantity of expression," the "number of issues discussed," the "depth of their exploration," and the "size of the audience reached." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (quoting *Buckley v. Valeo*, 424 U.S. 1, 19 (1976)). But they are not necessary for political speech to occur—individuals can converse about political issues without money changing hands. Likewise, the loudspeaker in *Saia* was not necessary for the preacher to convey his message but did facilitate the reach of that message. *See* 334 U.S. at 559–61. And that the press is "subject . . . to generally applicable regulations without offending the First Amendment" is

irrelevant here. *John K. MacIver Inst. for Pub. Pol'y v. Evers*, 994 F.3d 602, 613 (7th Cir. 2021). Taxes that "single[] out the press" implicate the First Amendment even though they do not directly regulate expression. *Id.* If the First Amendment were limited to only necessities, the "liberty of the press" would be "confined to newspapers and periodicals," but it instead "embraces pamphlets and leaflets" and "every sort of publication which affords a vehicle of information." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938).

Finally take history. The State brushes aside the Second Militia Act of 1792, Resp.Br.22–23, but the Act reflects the Second Congress's view of what was "necessary and proper," U.S. CONST. art. I, § 8, cl. 18, to "provide for . . . arming . . . the Militia," *id.* art. I, § 8, cl. 16. Through the exercise of those two powers, the Second Congress required "able-bodied" citizens to "provide" themselves with not only a "good musket or firelock" but also a "sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball." Act of May 8, 1792, 1 Stat. 271, 271. Although the State protests that some of these items might have been "necessary" under its theory, "[c]ommon accoutrements included flint," *Duncan*, 133 F.4th at 867, and bayonets have no purpose save for being attached to a firearm. Yet the Second Congress evidently thought that *all* these items were "necessary" to "arm[]" the militia. The Act is not instructive because of the relationship between the militia and the Second Amendment's prefatory clause; it is

11

instructive because it reflects the Second Congress's contemporaneous understanding of what it meant to "arm[]" someone. If it was "necessary" for the Second Congress to "arm[]" the militia with various accoutrements, it follows that law-abiding citizens also have the right to arm themselves with similar items that affect the functionality or facilitate the use of arms. *See Mock v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023) (Willett, J., concurring) ("[P]rotected Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms.").

B. Common sense, precedent, and history all indicate that the proper inquiry is whether an item is designed to facilitate the use or affect the functionality of an arm. Meanwhile, the State attacks a strawman with its numerous examples of ways in which other rights do not "protect everything that would in any way facilitate their exercise." Resp.Br.21. That the Supreme Court has held that some constitutional rights provide a floor to prevent their exercise from becoming meaningless does not establish that constitutional rights protect only what is strictly necessary to prevent them from being rendered meaningless. *Contra id.* at 20–21. Moreover, Plaintiffs' proposed standard is bounded in two important ways that the State ignores. First, it looks to the design or primary purpose of the item. It is not enough that an item incidentally facilitates firearm use; an item must be designed for that very purpose. That limitation puts an end to any parade of horribles about sweeping in items with only a tenuous or remote connection to the keeping and bearing of arms. Second, Plaintiffs' proposed standard requires that

12

the item affect the functionality or facilitate the use of an arm. The standard thus covers only items that are connected to the core exercise of the right to keep and bear arms.

This Court's decision in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), did not embrace the State's necessity theory. *Contra* Resp.Br.18. *Ezell* instead confirms that necessity is *not* the proper standard. *Ezell* recognized that the "core right wouldn't mean much without the training and practice to make it effective," but *Ezell* never suggested that training was necessary to the exercise of the right. 651 F.3d at 704. Nor could it. Although training undoubtedly enhances an individual's ability to exercise the right to bear arms as *Ezell* noted, training is not strictly necessary to exercise the right as even an untrained individual could keep and bear arms.

The decisions of other circuits do not move the needle either as none addressed the Second Amendment's coverage of firearm components. Although the Second Circuit described "ancillary rights" as "protected to the extent that they are 'necessary to the realization' of the textually specified right to keep and bear arms," that court was referring to "regulations on the means of acquiring, transporting, and storing firearms," which it concluded "only implicate the text of the Second Amendment if they meaningfully constrain the right to possess and carry arms." *United States v. Vereen*, 152 F.4th 89, 95 (2d Cir. 2025). That approach has no purchase where, as here, a law directly regulates a component designed to facilitate firearm functionality and thus constrains the right to possess and carry a modern form of firearm technology. The Sixth Circuit's decision in *Oakland Tactical Supply, LLC v. Howell Township* supports Plaintiffs' primary

argument that this Court should look to arms-bearing conduct, as *Oakland Tactical* states that "courts should look to the intersection of what the law at issue proscribes and what the plaintiff seeks to do." 103 F.4th 1186, 1196 (6th Cir. 2024). In any event, *Oakland Tactical* involved the effect of zoning provisions on the constructing and operating of a shooting range for long-distance target practice, not the operation of firearms. *Id.* at 1189; *but cf. Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (asking whether "our ancestors accepted prohibitions on the commercial operation of gun ranges in areas where they were otherwise allowed" and whether they "approved regulations barring training with common weapons in areas where firearms practice was otherwise permitted"). And the Tenth Circuit's decision in *Rocky Mountain Gun Owners v. Polis* is not helpful because it stated that the Tenth Circuit "need not decide in th[at] case the full scope of concomitant rights." 121 F.4th 96, 118 (10th Cir. 2024); *accord Ortega v. Grisham*, 148 F.4th 1134, 1148 (10th Cir. 2025).

C. Turning to the application of the correct standard, suppressors are plainly designed to facilitate or affect the functionality of firearms. A suppressor exists only to alter how a firearm operates. It reduces muzzle sound by approximately 20 to 30 decibels, reduces recoil and muzzle rise, and reduces muzzle flash. Opening.Br.9–10. Those design features bear directly on the operation of the firearm and on the safety and effectiveness of its use for hunting, training, and self-defense. As the Federal Government acknowledged in parallel litigation, "[a]ll these practical benefits demonstrate that suppressors facilitate the constitutional right to keep and bear arms."

14

Gov'ts Suppl. Resp. to Def.-Appellant's Pet. for Reh'g En Banc, *United States v. Peterson*, No. 24-30043 (5th Cir. May 29, 2025), ECF No. 135 at 4–5. Applying similar reasoning, the Federal Government has now sought to invalidate the District of Columbia's suppressor ban on Second Amendment grounds. *See* First Am. Compl., *United States v. District of Columbia*, Case No. 1:25-cv-04458-APM (D.D.C. May 14, 2026), ECF No. 28 ¶ 34.

The State's arguments do not alter that conclusion. The State never disputes that suppressors facilitate the use of firearms in the way that Plaintiffs identify. *See* Resp.Br.25–26. It instead observes that Plaintiffs can use firearms without suppressors, can train at firing ranges without them, and can rely on other forms of hearing protection. *Id.* at 26. The State also points to national data suggesting that not every firearm owner possesses a suppressor. *Id.* at 24–25. But each of these observations is potentially relevant only under the State's mistaken necessity test. Under the correct standard, the existence of a less effective way of exercising the right to keep and bear arms does not displace constitutional protection for a citizen's chosen method of exercise or chosen firearm technology. *Cf. Lovell*, 303 U.S. at 452 (First Amendment "embraces" "every sort of publication which affords a vehicle of information.").

The State's argument about hearing protection requires only a brief response. The State contends that suppressors are not the primary tool for protecting firearm users' hearing. Resp.Br.26. But Plaintiffs have never suggested that firearm users should use *only* suppressors to protect their hearing. Instead, suppressors offer the most *complete*

protection because they are the "only potentially effective noise control method to reduce" both firearm users' and bystanders' exposure to muzzle noise. Lilia Chen & Scott E. Brueck, *Noise and Lead Exposures at an Outdoor Firing Range – California*, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH (2011), https://perma.cc/GD82-YSL9; *see also* Michael Stewart, *Recreational Firearm Noise Exposure*, AM. SPEECH-LANGUAGE-HEARING ASS'N (2017), https://perma.cc/ME65-E5XB (advocating for the use of electronic hearing protection devices and suppressors). Because they "reduce overall noise, which makes it easier for students to hear the instructor," "firearms safety instructors often prefer that their students use suppressors." David Kopel, *The Hearing Protection Act and 'Silencers*,' WASH. POST (June 19, 2017), https://perma.cc/FYQ7-D7E3.

The State notably has no response to the study comparing muzzle suppression with ear-level hearing protection that concluded that "[a]ll suppressors offered significantly greater noise reduction than ear-level protection, usually greater than 50% better." Matthew P. Branch, *Comparison of Muzzle Suppression and Ear-Level Hearing Protection in Firearm Use*, 144 OTOLARYNGOLOGY-HEAD & NECK SURG. 950, 950 (2011). To suggest that earmuffs are superior to suppressors, the State instead clings to one quote from a commentator that otherwise endorsed the use of suppressors for hearing protection. Resp.Br.26. Meanwhile, the comparative study that the State ignores suggests, contrary to the State, that some experts do consider suppressors to be superior to earmuffs. *See* Branch, *supra*. Moreover, earmuffs are susceptible to misuse resulting

in a 10- to 20-decibel reduction in protection when "safety glasses disrupt[] the seal of the earmuff cushion with the side of the head." William J. Murphy & Randy L. Tubbs, *Assessment of Noise Exposure for Indoor and Outdoor Firing Ranges*, 4 J. OCCUPATIONAL & ENV'T HYGIENE 688, 695 (2007). In any event, even commentators who would not substitute suppressors for earmuffs nevertheless endorse using them together, along with ear plugs, for reduction in "perceived sound to around 100 decibels, the same as a power lawn mower." Kopel, *supra.*

The problem with "[d]ouble protection" at ear level is that it "significantly reduces the ability to localize stimuli, thereby reducing situational awareness." Murphy, *supra*, at 696. And the State never disputes that, for that reason, suppressors are the most effective method of hearing protection in self-defense situations because they may be stored attached to a firearm, protect bystanders and family members, and facilitate communication with others including first responders. Opening.Br.12.

The State also never says whether it believes the Second Amendment covers *any* form of hearing protection. One might read the State's brief to suggest that the Second Amendment covers *some* form of hearing protection but not suppressors. If so, the State's view is inconsistent with *Heller*, which rejected the notion that the government could ban handguns because rifles and shotguns were adequate alternatives. 554 U.S. at 629. But one might also read the State's brief to suggest that the Second Amendment covers *no* form of hearing protection. If so, a prohibition on the use of any form of hearing protection would cause great infringement, as citizens

would have to weigh their constitutionally protected use of arms against a government-mandated risk of hearing damage.

D. Finally, even if this Court were to adopt *Duncan*'s necessity standard (and it should not), under *Duncan*'s reasoning Illinois's suppressor ban *does* implicate the plain text of the Second Amendment. Just as some sort of magazine is necessary to the operation of a magazine-fed firearm that requires a magazine to operate (and, thus, according to *Duncan*, encompassed within the plain text of the Second Amendment), some sort of suppressor likewise is necessary for the operation of a *suppressed* firearm—after all, one cannot have a suppressed firearm without a suppressor, just as one cannot have a magazine-fed firearm without a magazine. *See id.* at 582 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."). Under *Duncan*'s own reasoning, then, Illinois's flat ban on suppressors implicates the Second Amendment, just as a flat ban on all magazines would.

The Ninth Circuit recently reached the contrary conclusion in *United States v. DeBorba*, an unreasoned decision that this Court should not follow even if it follows *Duncan*. *See United States v. DeBorba*, No. 24-3304, 2026 WL 1587553, at *4 (9th Cir. June 3, 2026). *DeBorba* simply asserted that suppressors are "'optional accessories'" like "gun slings" and "scopes" and thus "fall outside of the Second Amendment's plain text because they are 'accoutrements' not arms." *Id.* (quoting *Duncan*, 133 F.4th at 868). It never grappled with the fact that suppressors are necessary components of suppressed

18

firearms. To be sure, this Court should not follow *Duncan* for the reasons explained above. But even if it does, *DeBorba*'s unreasoned, one-sentence application of *Duncan* is not a persuasive basis for concluding that the Second Amendment does not cover suppressors.

## III. This Court Should Reverse and Remand for Entry of Judgment for Plaintiffs.

The State does not rebut Plaintiffs' argument that suppressors also satisfy *Bevis* because they are not exclusively or predominantly useful in military service or weapons that are not possessed for lawful purposes. *See* Opening.Br.35; Resp.Br.16.[1] The State contends that the "separate issue" of *Bevis* was not raised below and thus is not properly before the Court. Resp.Br.29. But *Bevis* addressed a materially similar issue to the one in this appeal: whether the plain text of the Second Amendment presumptively covers the possession of an item. 85 F.4th at 1192. Application of *Bevis* therefore involves, at most, separate arguments, not separate issues. But "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise argument they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). The State asks this Court to spurn judicial economy and countenance

---

[1] Adding further force to Plaintiffs' argument that suppressors are not predominantly useful in military service or weapons that are not possessed for lawful purposes is other countries' lenient regulation of suppressors. *See* Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 CUMB. L. REV. 33, 72–74 (2016) (cataloging European suppressor regimes and concluding that "suppressors are far more readily available" in those nations).

piecemeal litigation by simultaneously arguing that *Bevis* is binding precedent on the issue of whether something falls within the plain text of the Second Amendment while also arguing that the Court should give the State a second bite at the apple on remand.

Although Plaintiffs maintain that *Bevis* was wrongly decided, Opening.Br.34, the State's inability to establish that suppressors are exclusively or predominantly useful in military service or weapons that are not possessed for lawful purposes is fatal to the State's defense of its suppressor ban under *Bruen*'s second part. Suppressors are common arms that ordinary people safely possess for lawful purposes including self-defense; suppressors improve firearm safety; and suppressors are overwhelmingly possessed for lawful purposes. *Id.* at 35–37. *Bevis* explained that the "distinction between military and civilian weaponry [is] useful for *Bruen*'s second step, too." 85 F.4th at 1201. This Court has also explained that historic regulations of dangerous and unusual weapons often "limit[ed] weapons where the likely use for the weapon is a violent breach of the peace." *Rush*, 130 F.4th at 643. The State thus cannot carry its burden to establish that the suppressor ban "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

Entry of judgment for Plaintiffs is appropriate here because the State's inability to satisfy *Bruen*'s second part turns on legislative facts already briefed given the overlap between *Bevis* and *Bruen*'s second step. The State incorrectly contends that this Court entered judgment in *Moore* because of a "developed . . . factual record." Resp.Br.30. Not so. As in *Moore*, "there are no evidentiary issues" in this case because the suppressor

20

ban "does not present factual questions for determination in a trial." 702 F.3d at 942. The facts relevant to *Bruen* are "facts that bear on the justification for [the] legislation, as distinct from facts concerning the conduct of parties in a particular case ("adjudicative facts")." *Id.* Just as in *Moore*, "only legislative facts are relevant to the constitutionality of the Illinois gun law." *Id.* Accordingly, this Court should refuse to "engage in another round of historical analysis" and, like it did in *Moore*, remand for entry of judgment. *Id.*

## CONCLUSION

Because Illinois's suppressor ban is inconsistent with the Second and Fourteenth Amendments, this Court should reverse and remand for the entry of a declaration of unconstitutionality and a permanent injunction. At a minimum, this Court should hold that the district court erred in finding suppressors not covered by the plain text of the Second Amendment and remand for further proceedings.

Dated: June 10, 2026

Respectfully submitted,

/s/David H. Thompson

Stephen D. Stamboulieh
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
Telephone: (601) 852-3440
stephen@sdslaw.us

David H. Thompson
Peter A. Patterson
Athanasia O. Livas
Jack Tucker
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
Telephone: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com

Alan Alexander Beck
LAW OFFICE OF ALAN BECK
2692 Harcourt Drive
San Diego, CA 92123

21

Telephone: (619) 905-9105
alan.alexander.beck@gmail.com

*Attorneys for Plaintiffs-Appellants*
*Larry Morse and Theodore Ray Buck Jr.*

alivas@cooperkirk.com
jtucker@cooperkirk.com

David G. Sigale
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
Tel: (630) 452-4547
Fax: (630) 596-4445
dsigale@sigalelaw.com

*Attorneys for Plaintiffs-Appellants*
*Carlin Anderson and Dave Clark*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Garamond font, a proportionally spaced typeface, using Microsoft Word for Office 365. This Reply Brief complies with Fed R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because it contains 5,509 words, excluding the parts exempted by Fed R. App. P. 32(f).

Dated: June 10, 2026

/s/David H. Thompson
David H. Thompson

*Attorney for Plaintiffs-Appellants*
*Carlin Anderson and Dave Clark*

# CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2026, I electronically filed the foregoing Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that all participants in this appeal are registered CM/ECF users and will be served via the CM/ECF system.

/s/David H. Thompson
David H. Thompson

*Attorney for Plaintiffs-Appellants*
*Carlin Anderson and Dave Clark*